# IN THE SUPREME COURT OF IOWA

No. 16–0851

Filed April 20, 2018

**STATE OF IOWA,**

Appellee,

vs.

**NOAH RILEY CROOKS,**

Appellant.

---

Appeal from the Iowa District Court for Mitchell County, Gregg R. Rosenbladt and James M. Drew, Judges.

Defendant convicted of second-degree murder as a youthful offender for offense he committed at age thirteen challenges his fifty-year prison sentence imposed at age eighteen. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers and Denise A. Timmins, Assistant Attorneys General, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide challenges to Iowa's youthful offender laws raised by a defendant who at age thirteen fatally shot his mother. The State prosecuted him as a youthful offender in district court, and a jury found him guilty of second-degree murder. When he reached age eighteen, the district court sentenced him to an indeterminate prison term of up to fifty years (with no mandatory minimum). The defendant raises statutory and constitutional challenges to his prosecution and sentence, arguing that as a thirteen-year-old offender, his case should have remained in juvenile court and that at age eighteen he should have been released on probation or placed in a transitional facility rather than prison.

We retained his appeal and, for the reasons explained below, affirm his conviction as a youthful offender and his fifty-year indeterminate sentence with immediate parole eligibility. We conclude the district court properly exercised its discretion based on an individualized assessment of this defendant under a constitutional statutory scheme. We acknowledge sentencing reform efforts nationwide to raise the minimum age for prosecution in adult court. But under our constitutional separation of powers, those efforts should be directed to the legislature.

## I. Background Facts and Proceedings.

On the evening of March 24, 2012, Noah Crooks was at home with his mother, Gretchen Crooks. Noah was thirteen years old and an eighth grader at Osage Middle School. He had no prior criminal record. The Crooks lived in rural Osage, in Mitchell County. Gretchen worked as a nurse at Mercy Hospital in Mason City and was studying to get her master's degree at the University of Iowa. Noah's father, William Crooks,

worked at Cargill Kitchen Solutions in Mason City. William and Gretchen had been married for seventeen years.

William was at a work-related party away from home that evening when Noah loaded a .22 caliber rifle upstairs. Noah took the loaded rifle downstairs and saw his mother in the kitchen facing away from him. She was making dinner for him. Noah later told a child psychiatrist that he could not shoot her at that moment because it would not be honorable to shoot his mother in the back. Noah returned upstairs until his mother called up to say his dinner was ready. He returned downstairs with the rifle and this time found his mother sitting on the living room sofa studying her coursework. Noah shot her twenty-two times, killing her.

Noah sent his dad a text message at 7:30 p.m. The message stated, "Dad, this is Noah. I killed Mom accidentally. I regret it. Come home now please." William thought Noah was joking and replied, "Okay. Just throw her in the grove. We will take care of her later."

Noah called 911 and told the Mitchell County dispatcher, Barbara Michael, "I killed my mom with my twenty-two." He admitted he "shot her . . . with twenty rounds maybe." Noah also said, "I, I tried to rape her. . . . I didn't do it. I tried to rape her, I couldn't do it." Noah talked to the dispatcher about his concerns over his own future, stating,

> I'm never gonna be able to marry. . . . I'm never gonna get, be able to get a good job now, 'cause it'll be on my resume. . . . I mean, I'll barely be able to get a job like McDonald's. I mean I had plans of going to Michigan State University to get an engineering job, making my own car company. That's all down the drain now.

Deputy Jeff Huftalin was dispatched to the Crooks's residence and knocked on the front door. Noah answered the door while he was still on the phone with the dispatcher. Deputy Huftalin asked Noah where his

mother was. Noah told him she was in the living room and that the gun was on a chair. Deputy Huftalin asked Noah to sit on the porch while he entered the house. Deputy Huftalin found Gretchen slouched on the couch; he could see bullet holes in her chest. Gretchen's pajama top was unbuttoned, and she was naked from the waist down. Deputy Huftalin confirmed that Gretchen was dead. He handcuffed Noah and put him in the backseat of the patrol car.

Deputy Huftalin called William to tell him there had been an accident in his house and that he needed to come home. Upon arrival, William was told that Gretchen was dead and that Noah had shot her.

The State filed a delinquency petition four days later, alleging that Crooks, age thirteen, committed the delinquent acts of first-degree murder and assault with the intent to commit sexual abuse. The State requested that the juvenile court waive jurisdiction so that Crooks could be tried as a youthful offender in adult court, as provided in Iowa Code section 232.45(7) (2011). Crooks filed a motion to dismiss, challenging the juvenile court's statutory authority to waive jurisdiction over a thirteen-year-old. The juvenile court denied the motion. Crooks then filed a second motion to dismiss, this time asserting the youthful offender statute was unconstitutional. The juvenile court denied this motion, finding Crooks failed to establish that the statute was unconstitutional.

At the waiver-of-jurisdiction hearing, the juvenile court made the three findings required by Iowa Code section 232.45(7)(*a*) for transfer to district court: (1) Crooks was fifteen years of age or younger, (2) there was probable cause that Crooks committed the forcible felonies alleged in the petition, and (3) the State had established that there were no reasonable prospects for rehabilitating Crooks prior to his eighteenth

birthday if the juvenile court retained jurisdiction. The juvenile court waived jurisdiction over Crooks and transferred the case to the district court for Noah's prosecution as a youthful offender.

The State filed a trial information in district court, alleging murder in the first degree and assault with intent to commit sexual abuse. The jury trial began on April 30, 2013. Crooks raised the defenses of insanity and diminished responsibility. On May 13, the jury returned a verdict finding him guilty of murder in the second degree and not guilty of assault with the intent to commit sexual abuse. The court placed him on youthful offender status and transferred his supervision to the juvenile court for disposition under Iowa Code section 232.52.

After conducting a dispositional hearing, the juvenile court transferred guardianship of Crooks to the director of the Department of Human Services for placement at the State Training School in Eldora. Crooks was under the supervision of the juvenile court until his eighteenth birthday. The juvenile court conducted yearly review hearings, and Crooks remained at the State Training School. He attended school and participated in mental health treatment. He graduated from high school on May 29, 2015.

In April 2016, the juvenile court officer (JCO) filed a youthful offender report, and the juvenile court reported to the district court as required by Iowa Code section 232.56. The report noted that throughout his time at Eldora, Crooks tried to avoid addressing why he killed his mother. The JCO mentioned that when Crooks's father confronted him about his matricide, he responded that "[he] thought we would be better off without her." The JCO report elaborated,

> During a recent family meeting on April 14, 2016 with his father and counselors, Noah was asked again about why he killed his mother. He responded by saying, "I didn't think of

the consequences. I didn't think anything would happen. I thought I would maybe get grounded." This question has been asked of Noah throughout his therapy time at the State Training School. Any answer Noah could give would not be an acceptable answer to his father and family members.

The district court ordered a presentence investigation (PSI). The PSI report recommended incarceration:

> The defendant was 13 years of age when he shot and killed his mother. He will turn 18 on 07/29/16. Prior to his arrest on the instant offense he had no criminal history. He was involved in counseling with his family and was placed on psychotropic medication for a couple of years. There are reports he made comments to his peers at school about killing his mother and it would appear he bullied other children from time to time. It is also noted he was cruel to animals and may have burned down his grandmother's home when he was 5–6 years of age. These types of behaviors are disturbing for a child of his age. He admitted he was "arrogant and stuck up" and didn't really think anything bad was going to happen to him when he killed his mother.

> The defendant professes that he came from a good home and loved his family, yet he shot and killed his mother in their own home. He stated he was not angry at her and reported he was close to his mother. His behavior at the State Training School has been pretty unremarkable with a few minor violations. According to the defendant, he has had no major behavioral issues at the training school because he knows the rules and doesn't want to suffer the consequences that would come as a result of negative choices he might make. He graduated from high school and has dreams of attending college.

> The real concern is for public safety and how the defendant will conduct himself if allowed to return to society. No one can predict the future behavior of an individual with any certainty. He has been in institutional settings since the age of 13 and has learned to follow rules and modify his behavior in a structured setting. The concern is will others be placed at risk and will he create more victims in the future? If the defendant could offer a plausible explanation for why he shot and killed his mother, that might offer some insight into his thoughts and actions that day, but he can give no explanation for why he did what he did. For the protection of society, it is recommended the defendant be supervised at a higher level of supervision than what community based supervision can provide.

In light of the above it is respectfully recommended that the defendant be sentenced to a period of forty-five (45) years to the custody of the Director of the Department of Corrections.[1]

The district court held a hearing on May 6 to determine Crooks's status after his eighteenth birthday. The attorneys presented arguments. The State requested a fifty-year indeterminate sentence with no mandatory minimum. Crooks's attorney told the court,

> You only have two options under the statute itself. The first is to continue the youthful offender status itself or discharge him. That's it. There aren't — In the event that you continue the youthful offender status itself, then you have other options. You can place him on probation. You can confine him. You can do a number — You can suspend the sentence and you can provide all types of restrictions on probation, but that's it. And that's the position that we've taken.

His attorney further argued that *any* confinement or probation could not exceed five years, with credit provided for time served. He did not specifically request placement in a transitional facility.

Crooks read to the court a statement he wrote in which he described the groups he voluntarily joined at the State Training School and expressed his regret for taking his mother's life. He apologized to the people he hurt through his actions. Several family members gave victim-impact statements. His uncle (the victim's brother) requested the maximum sentence, and his maternal grandmother emphasized that he "doesn't have real empathy." William, the defendant's father, spoke last:

> [F]or four years we never talked about Gretchen, not once. He never had any remorse about his mom. I'd push him. . . . [H]e just wanted her out of his life because he can play video games. . . . [F]our years isn't long enough to pay for a wonderful woman who did so much at the hospital, for all of

---

[1]A forty-five-year recommended sentence allowed Crooks five years of sentencing credit for his time institutionalized at Eldora.

us, who were all of our rocks that we had to rely on. I — he needs to pay for his mother's life.

And I know that's hard to say, but it's just what it is, kid. It's time you face the piper, I guess, and letting you out today would ruin so many more lives. It honestly would.

The court determined that probation was not justified:

[T]he common theme throughout the documents that have been submitted, and even comments made here today, is that there has been a surprising lack of an emotional response from Noah, something showing appropriate remorse, empathy, which is understanding the feelings of the other people who have been affected by your actions. And I recognize that you are a young person, and there's a reason we treat young people differently. It's because sometimes emotionally they aren't developed enough to maybe respond in the appropriate way; but it is — it is very apparent to me, in reviewing the evidence, that for one reason or another, Noah, you just don't want to deal with this, with what you've done; and at some point in time you're going to have to, but it doesn't appear to me that that's happened yet. You've got some ground yet to cover and I think that there's work left to be done so I don't believe that a straight discharge at this time is appropriate.

. . . .

At this point I do not see sufficient evidence to convince me that Noah has been rehabilitated. The nature and circumstances of this offense, coupled with the lack of emotion, remorse, and empathy, indicates that there is a lot of ground to cover. There have been some recent expressions of remorse and attempts to show empathy, and I hope that those are sincere, but the fact that they are so recent causes me to wonder. And, Noah, going forward you'll have the opportunity to prove to everybody that you mean what you say. You've heard the saying "actions speak louder than words," and I suspect that's what your family is waiting for, and I know that's what the rest of us will be looking for as well.

I'm also concerned, when we talk about the appropriateness of street probation, that you have made the comment that you really don't think you have any need for future services. You made a comment, when asked whether you perhaps would want to return to the Training School to speak some day after you've been rehabilitated, you didn't really think so or you hoped not, I think were your words. You changed your answer after you were pressed on it a little bit, but those comments are concerning to me, that you still

don't have a full appreciation for what you've done and the legitimacy of everyone's concerns.

I am hopeful, but I'm not yet convinced, that it is safe for you to be free despite your young age. The lack of an appropriate emotional response, the lack of empathy, the lack of something that even approaches an adequate explanation for why this happened could be an indication that you just don't care. We just don't know yet. That's the point, we don't know. And I don't believe it's appropriate to release you on probation until we can be confident that that isn't the situation, but rather that you do care and that we don't have to worry about something like this happening down the road. And, in short, we need more time so that we can be confident in that determination.

So I do believe that the imposition of a sentence with incarceration is appropriate, and to that end it is necessary that I enter conviction.

The court entered judgment for murder in the second degree. The court sentenced Crooks to an indeterminate term of incarceration not to exceed fifty years without any mandatory minimum sentence.[2] Crooks was therefore immediately eligible for parole.

Crooks appealed. On appeal, he argues that Iowa Code section 232.45(7)(*a*) (2011) does not provide statutory authority to try a thirteen-year-old as a youthful offender. He also contends sections 232.45(7) and 907.3A violate article I, section 17 of the Iowa Constitution prohibiting cruel and unusual punishment. Finally, he argues that the sentencing court abused its discretion by incarcerating him. We retained his appeal.

## II. Standard of Review.

"[W]e review the juvenile court's interpretation of statutes for correction of errors at law." *In re A.M.,* 856 N.W.2d 365, 370 (Iowa 2014). Our review of constitutional challenges to a statute is de novo. *State v.*

---

[2]The court also ordered Noah to pay $150,000 in victim restitution. *See State v. Richardson*, 890 N.W.2d 609, 624 (Iowa 2017) (rejecting constitutional challenges to the $150,000 minimum restitution imposed on juvenile homicide offenders). Noah does not challenge the restitution on appeal.

*Thompson*, 836 N.W.2d 470, 483 (Iowa 2013). "We review the district court's sentence for an abuse of discretion." *State v. Hill*, 878 N.W.2d 269, 272 (Iowa 2016) (quoting *State v. Barnes*, 791 N.W.2d 817, 827 (Iowa 2010)).

### III. Analysis.

Crooks raises several challenges to the youthful offender provisions of the Iowa Code. We begin by providing a brief overview of the statutory scheme. We then consider whether the statutes permitted the juvenile court to waive jurisdiction over Crooks at age thirteen for prosecution as a youthful offender in district court. Because we conclude the juvenile court was statutorily authorized to do so, we next address his claim that the youthful offender statutes constitute cruel and unusual punishment in violation of article I, section 17 of the Iowa Constitution. We conclude that the waiver provisions do not constitute punishment, and we decline to impose a categorical bar on prosecuting thirteen-year-olds as youthful offenders in district court. Finally, we reject his claims that the district court abused its discretion by imposing a sentence of incarceration with no mandatory minimum.

**A. Overview of the Youthful Offender Statutes.** The youthful offender statutes were enacted in 1997 as part of comprehensive legislation related to juvenile justice. *See generally* 1997 Iowa Acts ch. 126 (entitled Juvenile Justice and Youthful Offenders). Generally, "[t]he juvenile court has exclusive original jurisdiction in proceedings concerning a child who is alleged to have committed a delinquent act unless otherwise provided by law . . . ." Iowa Code § 232.8(1)(*a*). However, the juvenile court may transfer cases to adult court.

> After the filing of a petition which alleges that a child has committed a delinquent act on the basis of an alleged commission of a public offense and before an adjudicatory

hearing on the merits of the petition is held, the county attorney or the child may file a motion requesting the court to waive its jurisdiction over the child for the alleged commission of the public offense or for the purpose of prosecution of the child as an adult or a youthful offender.

*Id.* § 232.45(1). Section 232.45(7)(*a*) sets forth the findings required for the juvenile court to waive its jurisdiction over a child who then can be prosecuted as a youthful offender in district court.

At the conclusion of the waiver hearing and after considering the best interests of the child and the best interests of the community the court may, in order that the child may be prosecuted as a youthful offender, waive its jurisdiction over the child if all of the following apply:

(1) The child is *fifteen years of age or younger.*

(2) The court determines . . . that there is probable cause to believe that the child has committed a delinquent act which would constitute a public offense under section 232.8, subsection 1, paragraph "*c*", notwithstanding the application of that paragraph to children aged sixteen or older.

(3) The court determines that the state has established that there are not reasonable prospects for rehabilitating the child, prior to the child's eighteenth birthday, if the juvenile court retains jurisdiction over the child and the child enters into a plea agreement, is a party to a consent decree, or is adjudicated to have committed the delinquent act.

*Id.* § 232.45(7)(*a*) (emphasis added).[3] The juvenile court, however, can waive its jurisdiction over the child for prosecution as an *adult* only when "[t]he child is fourteen years of age or older" and other conditions are met. *Id.* § 232.45(6).

---

[3]Subparagraph (1) was amended in 2013 to require that

[t]he child is twelve through fifteen years of age or the child is ten or eleven years of age and has been charged with a public offense that would be classified as a class "A" felony if committed by an adult.

2013 Iowa Acts ch. 42, § 5 (codified at Iowa Code § 232.45(7)(*a*)(1) (2014)).

**B. The Applicability of Iowa Code Section 232.45(7)(*a*) to Thirteen-Year-Old Offenders.** Crooks argues that Iowa Code section 232.45(7)(*a*) does not allow the juvenile court to waive jurisdiction over a thirteen-year-old child to be tried as a youthful offender in district court. He contends that, when related statutes are read together as a whole, section 232.45(7)(*a*) is ambiguous. We disagree and conclude the statutes unambiguously allow prosecution of a thirteen-year-old as a youthful offender. "[O]ur starting point in statutory interpretation is to determine if the language has a plain and clear meaning within the context of the circumstances presented by the dispute." *McGill v. Fish*, 790 N.W.2d 113, 118 (Iowa 2010).

Crooks emphasizes the different language used for the "traditional" waiver for prosecution as an adult and waiver for prosecution as a youthful offender. *Compare* Iowa Code § 232.45(6)(*a*) ("fourteen years of age *or older*" to be prosecuted as an adult (emphasis added)), *with id.* § 232.45(7)(*a*)(1) ("fifteen years of age *or younger*" to be prosecuted as a youthful offender (emphasis added)). He encourages us to read these provisions together as setting a lower age limit—a "floor"—of fourteen for children who can be prosecuted as youthful offenders. Subsections 6(*a*) and 7(*a*) describe waiver processes with quite different consequences, and we decline to impose the lower age limit for prosecution as an *adult* on the subsection regarding prosecution as a *youthful offender*. The legislature used different language in describing age limits throughout the statute and knows how to set a lower age limit. *See, e.g., id.* § 232.52(2)(*e*) ("at least twelve years of age"); *id.* § 232.54(1)(*h*)(1) ("age fourteen or over"). The legislature chose to include thirteen-year-olds within the youthful-offender waiver provision.

We see no ambiguity in the phrase "fifteen years of age *or younger*" whether read in isolation or in context of the entire statutory scheme. We conclude the juvenile court could properly waive jurisdiction over Crooks, who was age thirteen when he killed his mother, to allow his prosecution in district court as a youthful offender.

**C. The Constitutionality of Iowa Code Sections 232.45(7)(*a*) and 907.3A.** Crooks argues that Iowa Code sections 232.45(7)(*a*) and 907.3A—when applied to an offender age thirteen at the time of the crime—violate article I, section 17 of the Iowa Constitution prohibiting "cruel and unusual punishment." Under our de novo review of constitutional challenges to legislative enactments,

> we must remember that statutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt. Moreover, "the challenger must refute every reasonable basis upon which the statute could be found to be constitutional." Furthermore, if the statute is capable of being construed in more than one manner, one of which is constitutional, we must adopt that construction.

*Thompson*, 836 N.W.2d at 483 (quoting *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005)).

We first address Crooks's claim that the waiver of a child to district court for prosecution as a youthful offender under section 232.45(7) constitutes cruel and unusual punishment. Then we address his challenge to his fifty-year indeterminate sentence imposed under section 907.3A.

1. *Whether the waiver process of section 232.45(7) constitutes punishment.* Crooks claims the waiver process constitutes punishment because the decision to waive jurisdiction transfers a child from the juvenile system, which focuses on rehabilitation, to the adult system, which emphasizes incapacitation, retribution, and deterrence. *See In re*

*M.M.C.*, 564 N.W.2d 9, 11 (Iowa 1997) ("[T]he primary goal of juvenile justice in Iowa is rehabilitation, not punishment."); *see also State v. Oliver*, 812 N.W.2d 636, 646 (Iowa 2012) (identifying "four legitimate penological justifications: retribution, deterrence, incapacitation, and rehabilitation" (citing *Graham v. Florida*, 560 U.S. 48, 71, 130 S. Ct. 2011, 2028 (2010))). The statutory waiver changes the forum from juvenile court to district court, but with built-in protections for youthful offenders.

In order to waive jurisdiction for the child to be tried as a youthful offender, the juvenile court must make an individualized finding that "there are not reasonable prospects for rehabilitating the child, prior to the child's eighteenth birthday, if the juvenile court retains jurisdiction over the child." Iowa Code § 232.45(7)(*a*)(3) (2011). After jurisdiction is transferred from the juvenile court, the district court "*shall*, upon a plea of guilty or a verdict of guilty, defer sentence of a youthful offender . . . [and] transfer supervision of the youthful offender to the juvenile court for disposition in accordance with section 232.52." *Id.* § 907.3A(1) (emphasis added).[4] A youthful offender is treated the same as a child retained in the juvenile system until the child approaches age eighteen. At that point,

---

[4]The legislature amended section 907.3A in 2013. *See* 2013 Iowa Acts ch. 42, § 15 (adding language directing court to consider a presentence investigation report, if ordered, and renumbering the sentencing options for clarity). At the May 6, 2016 sentencing hearing, the court indicated the 2011 Code applied, and the parties agreed. With regard to the sentencing options, the State noted, "The 2013 Code is clearly written better than the 2011 Code section, and it's the State's opinion that that was the purpose of amending the statute. We don't believe that the 2013 [amendment] added anything different[;] it just is easier to read." The court agreed that the amendments "merely clarified the 2011 statute" and concluded that both statutes provided "the same options to the court." We rely on the 2011 Code applied by the district court and the parties but would reach the same conclusions under the 2013 amendment.

> [t]he court shall hold a hearing prior to a youthful offender's eighteenth birthday to determine whether the youthful offender shall continue on youthful offender status after the youthful offender's eighteenth birthday under the supervision of the court or be discharged. . . . The court shall make its decision after considering the services available to the youthful offender, the evidence presented, the juvenile court's report, the interests of the youthful offender, and interests of the community.

*Id.* § 907.3A(2). Adult punishment is discretionary with the district court, which has the options of discharging the youthful offender, "continu[ing] the youthful offender deferred sentence[,] or enter[ing] a sentence, which may be a suspended sentence."[5] *Id.* § 907.3A(2)–(3). As a result, the decision to waive jurisdiction over a child for prosecution as a youthful offender does not automatically subject the child to adult criminal sanctions. Instead, the youthful offender provisions allow the courts to wait until the child is nearly eighteen—and to see whether the rehabilitative services provided in the juvenile system have been effective—before determining how to proceed.

Waiver of a child for prosecution as a youthful offender is not a decision to abandon efforts to rehabilitate the child. To the contrary, the statutory scheme allows the state to focus on rehabilitating the child while at the same time giving the state the option to retain supervision of the child after the child's eighteenth birthday if the court finds the child cannot be rehabilitated within that time. The court is required to make

---

[5]Section 907.3A(3) limits the term of probation.

> [I]f the district court either continues the youthful offender deferred sentence or enters a sentence, suspends the sentence, and places the youthful offender on probation, the term of formal supervision shall commence upon entry of the order by the district court and may continue for a period not to exceed five years.

*Id.* § 907.3A(3). The court could decide to impose a sentence of incarceration for a term of years but does not have to do so. *See id.*

specific findings at each step of the process and has discretion with regard to the disposition, including when the child reaches age eighteen. We hold that the waiver process does not constitute punishment for purposes of article I, section 17 of the Iowa Constitution.

Other courts have held waiver statutes allowing prosecution of juveniles in adult court are not "punishment" for constitutional purposes. *See, e.g., State v. Jensen*, 385 P.3d 5, 9 (Idaho Ct. App. 2016) ("Being waived into adult court, whether mandatory or discretionary, is not a punishment."); *People v. Patterson*, 25 N.E.3d 526, 550–51 (Ill. 2014) (concluding that the automatic transfer statute does not impose punishment for purposes of the Eighth Amendment or the analogous state constitutional provision); *State v. Mays*, 18 N.E.3d 850, 861 (Ohio Ct. App. 2014) (concluding that provisions governing "whether a juvenile case must be transferred to adult court for adjudication" do not impose punishment); *cf. State v. Rodriguez*, 71 P.3d 919, 928 (Ariz. Ct. App. 2003) (concluding that the transfer statute "does not subject th[e] juvenile to enhanced punished [but instead] subjects the juvenile to the adult criminal justice system").

Crooks cites no case holding that a waiver statute transferring a juvenile to adult court constitutes punishment under an Eighth Amendment or comparable state constitutional analysis. He relies on language in three cases that tangentially support his claim. In *R.H. v. State*, the Alaska Court of Appeals explained,

> Nor can juvenile waiver proceedings realistically be said to affect "only the forum where the issue of guilt will be adjudicated." A juvenile waiver proceeding is the only available avenue by which the state may seek to prosecute a child as an adult.

777 P.2d 204, 210 (Alaska Ct. App. 1989). *R.H.* involved a claim that "court-ordered evaluations infringed [R.H.'s] right to be free from compelled self-incrimination"—not a claim that being tried as an adult constituted cruel and unusual punishment. *Id.* at 208. The Alaska court was distinguishing juvenile waiver hearings from competency proceedings in order to determine whether the court erred in requiring "R.H. to submit to a psychiatric evaluation for the purpose of determining his amenability to treatment as a child." *Id.* at 210–11.

Crooks also cites *Ramona R. v. Superior Court*, in which the California Supreme Court held that under the California Constitution, "testimony a minor gives at a fitness hearing . . . may not be used against him at a subsequent trial of the offense." 693 P.2d 789, 795 (Cal. 1985) (en banc). In support of this holding, the court stated that "the certification of a juvenile offender to an adult court has been accurately characterized as 'the worst punishment the juvenile system is empowered to inflict.'" *Id.* (quoting Note, *Separating the Criminal from the Delinquent: Due Process in Certification Procedure*, 40 S. Cal. L. Rev. 158, 162 (1967)). The *Ramona R.* court was *not* addressing a claim of cruel and unusual punishment but was instead considering whether "the [trial] court erred in refusing to grant [the minor defendant] immunity from use at trial of any statements she made in the fitness hearing or to her probation officer." *Id.* at 790. Finally, Crooks cites the dissent in *People v. Hana*, stating "[t]here can . . . be no question regarding the punitive nature of the decision to waive juvenile jurisdiction over [Hana]." 504 N.W.2d 166, 181 (Mich. 1993) (Cavanagh, C.J., dissenting). The Michigan Supreme Court majority concluded that Fifth and Sixth Amendment protections do not apply to juvenile waiver hearings to

determine whether the defendant should be prosecuted as a juvenile or as an adult. *Id.* at 169, 174 (majority opinion). The dissent concluded,

> I would remand this case to the juvenile court for a hearing to determine whether the statements and confessions introduced and considered at phase II of [Hana]'s juvenile waiver hearing were obtained in violation of his Fifth Amendment right to remain silent or his Sixth Amendment right to counsel.

*Id.* at 183 (Cavanagh, C.J., dissenting). The *Hana* court was not addressing a claim that the waiver constituted cruel and unusual punishment.

Moreover, in all three cases, the child would be tried *as an adult* and faced either life imprisonment or a prison sentence with a lengthy mandatory minimum. *See R.H.*, 777 P.2d at 210 (ninety-nine year sentence with a mandatory minimum of twenty years); *Ramona R.*, 693 P.2d at 795 (life imprisonment); *Hana*, 504 N.W.2d at 181 (mandatory life sentence without parole). By contrast, Crooks was tried as a youthful offender rather than as an adult and received a prison sentence with immediate parole eligibility and no mandatory minimum. None of these decisions persuade us that Iowa's waiver provision for youthful offenders constitutes punishment within the meaning of article I, section 17 of the Iowa Constitution, much less *cruel and unusual* punishment.

2. *Crooks's categorical challenge to the sentence imposed under section 907.3A.* Crooks claims that sentencing a thirteen-year-old as a youthful offender under section 907.3A violates article I, section 17 of the Iowa Constitution. He urges us to adopt a categorical bar on imposing punishment upon a child under the age of fourteen in adult court. We begin our analysis with a brief overview of federal and state jurisprudence on the prohibition of cruel and unusual punishment as it relates to juvenile sentencing.

The United States Supreme Court has interpreted the Eighth Amendment's Cruel and Unusual Punishment Clause as it relates to juvenile sentencing in a trilogy of cases, expanding the categorical challenges available to juvenile offenders challenging the death penalty or mandatory sentences of life without parole. *See generally Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012); *Graham*, 560 U.S. 48, 130 S. Ct. 2011; *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005). In *Roper*, the Supreme Court addressed the differences between juveniles and adults, including that juveniles lack maturity and "are more vulnerable or susceptible to negative influences and outside pressures." 543 U.S. at 569–70, 125 S. Ct. at 1195. The Court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Id.* at 578, 125 S. Ct. at 1200. In *Graham*, the Court held a sentence of life without parole for a juvenile offender for a nonhomicide offense violates the Eighth Amendment. 560 U.S. at 82, 130 S. Ct. at 2034. In *Miller*, the Court held that a mandatory life sentence for homicide without the possibility of parole violates the Eighth Amendment. 567 U.S. at 479, 132 S. Ct. at 2469.

We have applied the *Roper–Graham–Miller* reasoning under the Iowa Constitution and "built upon it and extended its principles." *State v. Sweet*, 879 N.W.2d 811, 832 (Iowa 2016). We held that the Iowa Constitution requires an individualized sentencing hearing before sentencing a juvenile offender to a lengthy mandatory minimum sentence of imprisonment. *See State v. Pearson*, 836 N.W.2d 88, 96 (Iowa 2013) (reversing thirty-five year mandatory minimum without the possibility of parole); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) (reversing 52.5-year mandatory minimum prison term). Then, in *State v. Lyle*, we held that

any automatic mandatory minimum prison sentences for juvenile offenders is unconstitutional under the cruel and unusual punishment clause of article I, section 17. 854 N.W.2d 378, 402–04 (Iowa 2014) (holding an individualized sentencing hearing applying the *Miller* factors is required for the imposition of a minimum sentence before parole eligibility). In *Sweet,* we adopted "a categorical rule that juvenile offenders may not be sentenced to life without the possibility of parole." 879 N.W.2d at 839.[6]

Crooks asks us to "take the next logical step and define at what age a child may be subject to adult prosecution and punishment" by adopting a categorical bar on sentencing an eighteen-year old in adult court for a crime committed at age thirteen. In considering whether to adopt a categorical approach to a class of offenders under the cruel and

---

[6]In response to *Miller* and related Iowa caselaw, the Iowa General Assembly in 2015 amended the statutory provisions relating to the sentencing of juveniles who commit class "A" felonies. *See Sweet,* 879 N.W.2d at 840 (Cady, C.J., concurring specially) (explaining that the 2015 amendment, which provided for a hearing and identified circumstances the court must consider, "addressed the constitutional deficiency identified in *Miller* and in our cases that followed"). The previous version of the statute required a mandatory minimum sentence of twenty-five years for a juvenile convicted of a class "A" felony that was not first-degree murder and prohibited parole for juveniles convicted of first-degree murder. Iowa Code § 902.1(2) (2015). Under the amended statute, a juvenile who commits first-degree murder shall be sentenced to (1) life without parole unless the governor commutes the sentence to a term of years, (2) life with the possibility of parole after serving a minimum term of confinement, or (3) life with the possibility of parole (with no minimum term of confinement). 2015 Iowa Acts ch. 65, § 1 (codified at Iowa Code § 902.1(2)(*a*) (2016)). A juvenile who commits a class "A" felony that is not first-degree murder shall be sentenced to either (1) life with the possibility of parole after serving a minimum term of confinement or (2) life with the possibility of parole (with no minimum term of confinement). 2015 Iowa Acts ch. 65, § 2 (codified at Iowa Code § 902.1(3)(*a*) (2016)). *Sweet*'s categorical prohibition on life-without-parole sentences for juvenile offenders eliminated that sentencing option in the 2015 enactment. *See Sweet,* 879 N.W.2d at 840 ("[T]he new statutory scheme adopted by our legislature for sentencing juvenile offenders convicted of first-degree murder to life without the possibility of parole violates the cruel and unusual punishment clause."). *State v. Zarate* rejected a facial challenge to the remaining provisions of section 902.1(2). ___ N.W.2d ___, ___ (Iowa 2018).

unusual punishment clause of article I, section 17, we apply the two-step approach used by the United States Supreme Court under the Eighth Amendment. *Sweet,* 879 N.W.2d at 835 (majority opinion). We first consider whether there is a consensus—or at least an emerging consensus—to guide our consideration of the question. *Id.* We then "exercise our independent judgment to determine whether to follow a categorical approach." *Id.* In exercising our independent judgment, we are "guided by 'the standards elaborated by controlling precedents and by [our] own understanding and interpretation of the [Iowa Constitution's] text, history, meaning, and purpose.'" *Lyle,* 854 N.W.2d at 386 (alterations in original) (quoting *Graham,* 560 U.S. at 61, 130 S. Ct. at 2022). We also "consider 'the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question.'" *Id.* (quoting *Graham,* 560 U.S. at 67, 130 S. Ct. at 2026).

"Substantial deference is afforded the legislature in setting the penalty for crimes." *State v. Cronkhite,* 613 N.W.2d 664, 669 (Iowa 2000) (rejecting constitutional challenges to fifty-year indeterminate sentence for second-degree murder).[7] In *Lyle,* we discussed in the context of

---

[7]The United States Supreme Court has observed that "the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'" *Atkins v. Virginia,* 536 U.S. 304, 312, 122 S. Ct. 2242, 2247 (2002) (quoting *Penry v. Lynaugh,* 492 U.S. 302, 331, 109 S. Ct. 2934, 2953 (1989), *abrogated on other grounds by Atkins,* 536 U.S. at 321, 122 S. Ct. at 2252); *see also Gregg v. Georgia,* 428 U.S. 153, 174–76, 96 S. Ct. 2909, 2925–26 (1976) (basing Eighth Amendment analysis on state legislative judgments as reflecting the moral values of the American people). Chief Justice Roberts recently noted,

> This Court's precedents have emphasized the importance of state legislative judgments in giving content to the Eighth Amendment ban on cruel and unusual punishment. . . . The "clearest and most reliable objective evidence of contemporary values" comes from state legislative judgments. Such legislative judgments are critical because in "a democratic society legislatures, not courts, are constituted to respond to

juvenile sentencing the deference owed to the elected branches under our separation of powers and reiterated that "[l]egislative judgments can be 'the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual.' " 854 N.W.2d at 388 (quoting *State v. Bruegger*, 773 N.W.2d 862, 873 (Iowa 2009)). We added, "Just as we typically 'owe substantial deference to the penalties the legislature has established for various crimes,' we owe equal deference to the legislature when it expands the discretion of the court in juvenile sentencing." *Id.* (quoting *Oliver*, 812 N.W.2d at 650). We elaborated on the importance of the discretion afforded our courts when adjudicating juvenile offenders:

> Here, the legislative decision to back away from mandatory sentencing for most crimes committed by juveniles weakens the notion of a consensus in favor of the practice of blindly sentencing juveniles based on the crime committed. In fact, it helps illustrate a building consensus in this state to treat juveniles in our courts differently than adults.
>
> Actually, the statutory recognition of the need for some discretion when sentencing juveniles is consistent with our overall approach in the past in dealing with juveniles. Primarily, the juvenile justice chapter of our Code gives courts considerable discretion to take action in the best interests of the child.

*Id.* Iowa's youthful offender statutes require appropriate factual findings for discretionary, individualized waiver, and sentencing determinations.

---

the will and consequently the moral values of the people." And we have focused on state enactments in this realm because of the "deference we owe to the decisions of the state legislatures under our federal system . . . where the specification of punishments is concerned." For these reasons, we have described state legislative judgments as providing "essential instruction" in conducting the Eighth Amendment inquiry.

*Moore v. Texas*, 581 U.S. ___, ___, 137 S. Ct. 1039, 1056–57 (2017) (Roberts, C.J., dissenting) (first quoting *Atkins*, 536 U.S. at 312, 122 S. Ct. at 2247; then quoting *Gregg*, 428 U.S. at 175, 96 S. Ct. at 2926; then quoting *id.* at 176, 96 S. Ct. at 2926; then quoting *Roper*, 543 U.S. at 564, 125 S. Ct. at 1192).

*See* Iowa Code § 232.45(7)(*a*); *id.* § 907.3A(2). For that reason, we uphold the legislature's enactment permitting prosecution of thirteen-year-old defendants as youthful offenders in district court upon the requisite judicial findings.

Crooks acknowledges that twenty-one states authorize children under the age of fourteen to be prosecuted and punished as adults.[8] He

[8]*See* Alaska Stat. Ann. § 47.12.100 (West, Westlaw through 2017 1st Reg. Sess. & 4th Spec. Sess. of the 30th Leg.) (no lower age limit); Colo. Rev. Stat. Ann. § 19-2-518(1)(a) (West, Westlaw through ch. 85 of the 2d Reg. Sess. of the 71st Gen. Assemb. (2018)) (age twelve or older for discretionary waiver for specified offenses); Ga. Code Ann. §§ 15-11-560 to -561 (West, Westlaw through 2017 Sess. of Gen. Assemb.) (age thirteen or older for exclusive adult jurisdiction for specified offenses and for discretionary transfer for specified offenses); Idaho Code Ann. §§ 20-508 to -509 (West, Westlaw through 2d Reg. Sess. of the 64th Idaho Leg.) (under age fourteen for discretionary waiver for specified offenses); 705 Ill. Comp. Stat. Ann. 405/5-805(3), -810 (West, Westlaw through P.A. 100-582 of the 2018 Reg. Sess.) (age thirteen or older for discretionary wavier and for extended jurisdiction juvenile prosecution); Me. Rev. Stat. Ann. tit. 15, § 3101(4) (Westlaw through ch. 351 of the 2017 2d Reg. Sess.) (no lower age limit); Miss. Code Ann. §§ 43-21-151, -157 (West, Westlaw through 2018 Reg. Sess.) (age thirteen or older for exclusive adult jurisdiction for specified offenses; age thirteen and older for discretionary waiver); Mo. Ann. Stat. § 211.071 (West, Westlaw through 2d Extraordinary Sess. of the 99th Gen. Assemb.) (age twelve or older for discretionary transfer); Mont. Code Ann. § 41-5-206 (West, Westlaw through 2017 Sess.) (age twelve or older for discretionary transfer for specified offenses); Nev. Rev. Stat. Ann. § 62B.390 (West, Westlaw through 79th Reg. Sess. (2017)) (age thirteen or older for discretionary transfer for murder or attempted murder); N.H. Rev. Stat. Ann. § 628:1(II) (Westlaw through ch. 7 of the 2018 Reg. Sess.) (age thirteen or older for discretionary waiver for specified offenses); N.Y. Penal Law § 30.00(2) (McKinney, Westlaw through L.2018, ch. 1 to 3) (age thirteen or older to be criminally responsible for specified offenses); N.C. Gen. Stat. Ann. § 7B-2200 (West, Westlaw through 2017 Reg. Sess.) (age thirteen or older for transfer for felonies); Okla. Stat. Ann. tit. 10A, § 2-5-101 (West, Westlaw through ch. 6 & 7 of 2d Extraordinary Sess. of the 56th Leg.) (child age thirteen or older charged with first-degree murder shall be considered an adult); 42 Pa. Stat. and Cons. Ann. § 6302 (West, Westlaw through 2018 Reg. Sess. Act 10) (excluding murder from the definition of "delinquent act"); 14 R.I. Gen. Laws Ann. § 14-1-7 to -7.1 (West, Westlaw through ch. 480 of the Jan. 2017 Sess.) (no lower age limit for discretionary waiver for offense punishable by life imprisonment if committed by an adult); S.C. Code Ann. § 63-19-1210 (Westlaw through 2018 Act No. 133) (no lower age limit for discretionary transfer for murder or criminal sexual conduct); S.D. Codified Laws § 26-8C-2 (Westlaw through 2018 Reg. Sess. effective Mar. 23, 2018 & Supreme Court Rule 17-12) (age ten or older to be "delinquent child"); *id.* § 26-11-4 (delinquent child charged with felony may be tried in circuit court); Tenn. Code Ann. § 37-1-134 (West, Westlaw through 2018 2d Reg. Sess., effective through Mar. 22, 2018) (no lower age limit for discretionary waiver for specified offenses); Vt. Stat. Ann.

also concedes that there appears to be no consensus on the minimum age to hold children criminally responsible. But he notes that "consensus is not dispositive." *Lyle*, 854 N.W.2d at 387 (alteration omitted) (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 421, 128 S. Ct. 2641, 2650 (2008)).

Crooks relies on a recent study authored by Jeree Thomas, Policy Director at the Campaign for Youth Justice (CFYJ), entitled Raising the Bar: State Trends in Keeping Youth Out of Adult Courts (2015-2017), http://cfyj.org/images/A-StateTrends_Report-Web.pdf. The focus of that report is on *legislative* reform efforts. *See id.* at 38. The report cites no judicial decisions invalidating enactments allowing or requiring transfer of youthful offenders to adult court. Rather, the report urges state legislatures to raise the minimum age for prosecution as adults. *See id.* at 7–8 (noting "[f]our states have passed laws to raise the age of juvenile court jurisdiction so that 16- and/or 17-year-olds are not automatically prosecuted as adults"). The report also advocates restoring judicial discretion on waiver and transfer decisions lacking in many states. *See id.* at 35. The Iowa youthful offender laws already provide for such judicial discretion. We agree with the CFYJ that policy-based arguments for juvenile sentencing reform should be directed to the legislature.

We next exercise our independent judgment. *See Lyle*, 854 N.W.2d at 386. In doing so, we decline to adopt the categorical bar Crooks requests because the individualized protections available to youthful offenders do not offend *Lyle* or its progeny. The juvenile court must

---

tit. 33, § 5204 (West, Westlaw through Adjourned Sess. of the 2017–2018 Vt. Gen. Assemb.) (age twelve to fourteen for discretionary transfer for specified offenses); Wis. Stat. Ann. § 938.183 (West, Westlaw through 2017 Act 142) (age ten or older for exclusive adult court jurisdiction for specified offenses).

conduct an individualized hearing and consider specified factors before deciding to waive jurisdiction to permit the defendant to be tried as a youthful offender. After the youthful offender is found guilty, the district court *must* transfer supervision back to the juvenile court for disposition under section 232.52, which requires the juvenile court to "enter the least restrictive dispositional order appropriate" in view of additional factors. Then, the district court, after conducting another individualized hearing prior to the youthful offender's eighteenth birthday, has the discretion to select one of four sentencing options: (1) discharge the youthful offender from the court's jurisdiction, (2) continue the deferred sentence for a term not to exceed five years, (3) impose a suspended sentence and place the youthful offender on probation for a period not to exceed five years, or (4) impose an indeterminate sentence with or without a mandatory minimum. *See* Iowa Code § 907.3A. These statutorily mandated individualized hearings are consistent with the constitutional protections we required in *Lyle*.

In *Miller*, the United States Supreme Court explained that "the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court—and so cannot satisfy the Eighth Amendment." 567 U.S. at 489, 132 S. Ct. at 2475. The Court elaborated,

> Even when States give transfer-stage discretion to judges, it has limited utility. First, the decisionmaker typically will have only partial information at this early, pretrial stage about either the child or the circumstances of his offense. . . . The key moment for the exercise of discretion is the transfer—and as Miller's case shows, the judge often does not know then what she will learn, about the offender or the offense, over the course of the proceedings.
>
> Second and still more important, the question at transfer hearings may differ dramatically from the issue at a

post-trial sentencing. Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult (here, life without parole). In many States, for example, a child convicted in juvenile court must be released from custody by the age of 21. Discretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a lengthy term of years. [I]t is easy to imagine a judge deciding that a minor deserves a (much) harsher sentence than he would receive in juvenile court, while still not thinking life-without-parole appropriate.

*Id.* at 488–89, 132 S. Ct. at 2474–75 (citations omitted).

We conclude the Iowa youthful offender statutes provide the discretionary, individualized posttrial sentencing that *Miller* requires. Indeed, the Iowa statutes go beyond what *Miller* requires: instead of the district court imposing a sentence immediately after the initial determination of guilt, the district court is required to transfer supervision of the youthful offender back to the juvenile court until he or she reaches age eighteen. Only upon the offender's eighteenth birthday does the district court select among the sentencing options in section 907.3A. This provides additional time (nearly five years from age thirteen for Crooks) to track the juvenile offender's progress towards rehabilitation before imposing any prison sentence. We reject Crooks's challenge to section 907.3A under article I, section 17 of the Iowa Constitution.

**D. The District Court's Discretion to Impose the Prison Sentence.** Crooks also claims the district court abused its discretion in imposing a sentence of an indeterminate term of incarceration not to exceed fifty years. As quoted above, the court explained in great detail the reasons for its sentence. Crooks argues the district court abused its discretion in three ways: (1) by overlooking other available options

besides incarceration or street probation, (2) by failing to apply the *Miller/Lyle* factors, and (3) by imposing incarceration. We address each of these claims in turn.

1. *Considering the available options.* Crooks claims the district court failed to recognize the sentencing options available and therefore failed to properly exercise its discretion. *Cf. Hill*, 878 N.W.2d at 272 ("When a sentence is not mandatory, the district court must exercise its discretion . . . ." (quoting *State v. Millsap*, 704 N.W.2d 426, 433 (Iowa 2005))). He specifically points to the judge's statements, "I've got probation on the one hand or I've got an indeterminate term not to exceed 50 years on the other hand," and "[s]o, simply stated, I have two options at this point in time. One is some type of street probation and the other would be a term of incarceration."

Sentencing decisions of the district court are cloaked with a strong presumption in their favor. *State v. Hopkins*, 860 N.W.2d 550, 553 (Iowa 2015). "A defendant therefore has the burden to provide a record showing that the court abused its discretion." *State v. Ayers*, 590 N.W.2d 25, 29 (Iowa 1999). Crooks has failed to meet this burden. The record shows that the district court *was* aware of the options available to it. The court knew that discharge was an option and explicitly rejected that option: "I don't believe that a straight discharge at this time is appropriate." The court also acknowledged the five-year limit on probation and stated, "I'm also concerned, when we talk about the appropriateness of street probation, that you have made the comment that you really don't think you have any need for future services." This shows the court understood that it could impose conditions on probation.

Additionally, "a sentencing court need only explain its reasons for selecting the sentence imposed and need not explain its reasons for rejecting a particular sentencing option." *Id.* at 28. The court explained why it was imposing incarceration:

> I am hopeful, but I'm not yet convinced, that it is safe for you to be free despite your young age. The lack of an appropriate emotional response, the lack of empathy, the lack of something that even approaches an adequate explanation for why this happened could be an indication that you just don't care. We just don't know yet. That's the point, we don't know. And I don't believe it's appropriate to release you on probation until we can be confident that that isn't the situation, but rather that you do care and that we don't have to worry about something like this happening down the road. And, in short, we need more time so that we can be confident in that determination.
>
> So I do believe that the imposition of a sentence with incarceration is appropriate, and to that end it is necessary that I enter conviction.

The court did not fail to consider the available options and explained why it selected the sentence it imposed. The court therefore did not abuse its discretion.

2. *Failing to consider the* Miller/Lyle *factors.* Crooks also claims that the district court abused its discretion by failing to consider the *Miller* factors. He cites *Null* for the proposition that, in sentencing a juvenile as an adult when a mandatory minimum sentence is an option, the district court must also "undertake an analysis of '[e]verything . . . said in *Roper* and *Graham*' about youth." *Null*, 836 N.W.2d at 74 (alteration in original) (quoting *Miller*, 567 U.S. at 476, 132 S. Ct. at 2467). Under *Miller*, the United States Supreme Court held that the Eighth Amendment prohibits *mandatory* life sentences without the possibility of parole for offenders under eighteen at the time of their crimes. *Miller*, 567 U.S. at 465, 132 S. Ct. at 2460. These factors are

(1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Lyle,* 854 N.W.2d at 404 n.10 (quoting *Miller,* 567 U.S. at 477–78, 132 S. Ct. at 2468). In *Lyle,* we extended the holding of *Miller* to require the district court to expressly consider the *Miller/Lyle* factors before imposing *any* mandatory minimum sentence on a juvenile offender. *Id.* ("[T]he portion of the statutory schema requiring a juvenile to serve seventy percent of the period of incarceration before parole eligibility may not be imposed without a prior determination by the district court that the minimum period of incarceration without parole is warranted under the factors identified in *Miller* and further explained in *Null.*"). In *State v. Roby,* we required the district court to consider "the relevant mitigating factors of youth" before imposing a minimum term of incarceration before the juvenile offender is eligible for parole. 897 N.W.2d 127, 148 (Iowa 2017). In *State v. White,* we emphasized the importance of expert testimony to support a minimum period of incarceration. 903 N.W.2d 331, 333 (Iowa 2017).

Crooks argues on appeal that, because a minimum period of incarceration before parole eligibility was an available option, the district court was required to consider the *Miller/Lyle* factors "on the record." The State responds that the court is only required to consider the *Miller/Lyle* factors if it contemplates imposing a mandatory minimum sentence. In *State v. Propps,* we expressly "decline[d] to extend the requirement of a *Miller* individualized sentencing hearing to juvenile

defendants who are not subject to a mandatory minimum period of incarceration." 897 N.W.2d 91, 104 (Iowa 2017). We explained,

> Because an indeterminate sentence allows for immediate eligibility for parole, a juvenile is able to demonstrate to the parole board whether he or she appreciated the harm done and utilized the options available for reform. If rehabilitation has not yet occurred, the parole board may make the decision to continue incarceration until the juvenile has demonstrated through his or her own actions the ability to appreciate the severity of the crime. This is consistent with the approach of our prior holdings in the area of juvenile sentencing, because it allows for a realistic and meaningful opportunity for parole upon the juvenile's demonstration of maturity and rehabilitation.

*Id.* at 102. We therefore held that "a meaningful, reasonable, and immediate opportunity for parole . . . is all that is required under our decision in *Lyle* and the United States and Iowa Constitutions." *Id.* at 104. As the concurring opinion observed, "[t]he constitutional protections we have recognized do not target mandatory incarceration of juvenile offenders, but [their] mandatory incarceration . . . with no opportunity during the period of incarceration to show the greater likelihood of rehabilitation and reform has occurred." *Id.* at 105 (Cady, C.J., specially concurring); *cf. State v. Richardson*, 890 N.W.2d 609, 622, 626 (Iowa 2017) (declining to require consideration of *Miller/Lyle* factors before imposing $150,000 restitution award on a juvenile homicide offender).

When sentencing Crooks, the district court expressly declined to consider imposing a mandatory minimum.

> [I]f incarceration is ordered there's no mandatory minimum. The State is not seeking that. . . . And so when I sentence someone to incarceration I don't say, "I sentence you to 50 years," I say, "I sentence you to an indeterminate term not to exceed 50 years," and at that point in time the Board of Parole takes over and makes a determination as to when a person should be released from prison. And so it's important

to keep in mind that even though people throw around 50 years, it doesn't mean 50 years, at least not necessarily.

Under *Propps*, no hearing on the *Miller/Lyle* factors was required to sentence Crooks to prison with immediate eligibility for parole. 897 N.W.2d at 102, 104.

Nevertheless, we reiterate that "[a] sentencing court is to consider any mitigating circumstances relating to a defendant." *State v. Witham*, 583 N.W.2d 677, 678 (Iowa 1998). These include the circumstances of youth and, specifically, any applicable *Miller/Lyle* factors. *See State v. Zarate*, ___ N.W.2d ___, ___ (Iowa 2018) ("We also hold that the district court's consideration of any potential aggravating factors . . . shall align with our juvenile sentencing jurisprudence so as not to overwhelm the mitigating factors associated with youth, especially the five factors of youth set forth in *Lyle*."). Once the sentencing court declines to impose a minimum period of incarceration without parole, the *Miller/Lyle* factors remain relevant in considering the remaining sentencing options, along with all other mitigating and aggravating circumstances. Yet the court is not required to specifically examine and apply each factor on the record at this point but considers all relevant factors in exercising its discretion to select the proper sentencing option. We may find an abuse of discretion "[i]f a sentencing court fails to consider a relevant factor that should have received significant weight." *Zarate*, ___ N.W.2d at ___ (alteration in original) (quoting *Roby*, 897 N.W.2d at 138).

The record reveals the sentencing court addressed a variety of factors in response to the evidence and argument presented by Crooks, including those *Miller/Lyle* factors identified by Crooks. We find no abuse of discretion. As a result, we turn to address the final argument

by Crooks that the sentencing court abused its discretion by imposing incarceration.

3. *Imposing sentence of incarceration.* Crooks additionally claims the district court abused its discretion by imposing incarceration. He asserts that the court imposed incarceration based on "the belief that Crooks is not rehabilitated and poses a potential danger to society" and that the evidence presented at the sentencing hearing does not support this conclusion. We disagree.

The court was required to "make its decision after considering the services available to the youthful offender, the evidence presented, the juvenile court's report, the interests of the youthful offender, and interests of the community." Iowa Code § 907.3A(2). "[O]ur task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *State v. Seats*, 865 N.W.2d 545, 553 (Iowa 2015) (quoting *State v. Formaro*, 638 N.W.2d 720, 725 (Iowa 2002)). A district court has not abused its discretion if the evidence supports the sentence. *Id.*

We conclude the district court did not abuse its discretion in imposing a sentence of incarceration. Dr. Michael Taylor, who evaluated Crooks in 2012, emphasized in his August 12, 2012 report,

> With a strong degree of medical certainty, I can state that the prospects for rehabilitating Noah Crooks prior to his eighteenth birthday are nil. He has no psychiatric illness (which had any impact on his actions) which might be treated—absent a brain transplant. He appears to not be capable of experiencing guilt and/or remorse. He is not capable of considering the impact that his actions might have on others—except himself. His actions vis-à-vis the murder of his mother were part and parcel of deeply-ingrained personality traits which have been present for years, despite his relative youth, and will continue to be present for the foreseeable future. There is no treatment known to man that can change these personality traits as Noah grows older. It is highly probable, however, that Noah

will become more skilled at "saying the right things" to cover up his severe psychopathology until he is no longer in a secure facility.

Dr. Augspurger, a psychiatrist who evaluated Crooks both in 2013 and in 2016, concluded after the 2016 evaluation that Crooks does not have a diagnosable mental disorder. Dr. Augspurger stated that "it cannot still be said that [Crooks] is developing an Antisocial Personality Disorder since he has not outwardly displayed evidence for the behavior required to substantiate such a diagnostic development since admission [at the State Training School]." But Dr. Augspurger concluded,

> This could all be illusion, but it could just as well be reality and I would certainly rather have him being productive and behaving in a prosocial manner compared with the opposite. If one believes in the purpose of having a separate juvenile judicial system, that it is possible and desirable to educate and train young people in the hopes of changing them, then one must be hopeful that he is a successful product of that system. However, I have no ability to predict the future and cannot offer assurances one way or the other.

Dr. Augspurger's equivocal opinions did not compel the district court to discharge Crooks or release him on probation. The district court acted within its discretion by imposing an indeterminate sentence of incarceration not to exceed fifty years, with immediate eligibility for parole and no mandatory minimum term.

## IV. Disposition.

For these reasons, we affirm Crooks's judgment of conviction and sentence.

**AFFIRMED.**

All justices concur except Appel, Wiggins, and Hecht, JJ., who concur in part and dissent in part.

**APPEL, Justice (concurring in part and dissenting in part).**

I concur with the majority's disposition with respect to some aspects of this case, but would vacate the decision of the district court and remand the case for consideration of the *Lyle* factors before convicting and sentencing Crooks. *See State v. Lyle*, 854 N.W.2d 378, 404 n.10 (Iowa 2014); *see also Miller v. Alabama*, 567 U.S. 460, 477–78, 132 S. Ct. 2455, 2468 (2012).

## I. Statutory Interpretation Regarding Age Floor.

On the question of statutory interpretation, I agree with the majority that the legislature did not establish a floor for the age of a child who might be treated as a youthful offender. Iowa Code section 232.45 (2011) sets out two paths for waiving children into district court. Under section 232.45(6), a child who is fourteen years of age or older may be tried as an adult. Under section 232.45(7)(*a*), a child who is fifteen years of age or younger may be tried as a youthful offender. The notion that a juvenile transfer statute has no lower limit is not a stranger to the law. *See Miller*, 567 U.S. at 486 & n.14, 132 S. Ct. at 2473 & n.14 (citing statutes). We should be hesitant to read language into a statute absent a compelling reason to do so. *See State v. Nicoletto*, 862 N.W.2d 621, 625 (Iowa 2015); *State v. Romer*, 832 N.W.2d 169, 177–78 & n.6 (Iowa 2013); *see also State v. Coleman*, 907 N.W.2d 124, 150 (Iowa 2018) (Appel, J., concurring in part and dissenting in part).

## II. Categorical Constitutional Attack on Trying Thirteen-Year-Olds as Youthful Offenders.

The notion that juvenile offenders should be subject to transfer with adult criminal sanction regimes has been subject to attack in the literature. One prominent authority has argued that juvenile offenders

should never be integrated with adult offenders and should not be incarcerated beyond the age of twenty-five. *See* Christopher Slobogin, *Treating Juveniles Like Juveniles: Getting Rid of Transfer and Expanded Adult Court Jurisdiction*, 46 Tex. Tech. L. Rev. 103, 104–05, 131 (2013). Other attacks on transfer of children to adult court focus on automatic transfers, transfers arising out of the exercise of prosecutorial discretion, and the imposition of mandatory sentencing schemes applicable to adults upon transfer. *See* Ioana Tchoukleva, Note, *Children Are Different: Bridging the Gap Between Rhetoric and Reality Post* Miller v. Alabama, 4 Cal. L. Rev. Cir. 92, 102–03 (2013).

The lack of an age floor in a statute that may lead to transfer is potentially problematic as certainly at some point very young children simply cannot be held criminally culpable consistent with the cruel and unusual punishment clause of article I, section 17 of the Iowa Constitution. The Iowa statute, however, allows district courts to make the question of whether a thirteen-year-old child is potentially exposed to criminal sanctions on a case-by-case basis. *See* Iowa Code § 232.45(9).[9]

Sometimes, however, case-by-case evaluations under multifactor tests are so arbitrary that a categorical rule is preferable and even constitutionally required. This is particularly true when we attempt to predict future behavior. In *State v. Sweet*, for instance, we announced a categorical rule that life without the possibility of parole for juvenile offenders would not be permitted in large part because it was simply impossible to determine with any accuracy which juvenile offender is so

---

[9]The common law set a rebuttable presumption of incapacity to commit any felony at the age of fourteen. Craig S. Lerner, *Juvenile Criminal Responsibility: Can Malice Supply the Want of Years?*, 86 Tulane L. Rev. 309, 317 (2011). The common law allowed the presumption to be rebutted by strong and clear evidence that the juvenile possessed the necessary understanding and judgment to form criminal intent. *Id.*

incorrigible that no "second look" should be permitted. 879 N.W.2d 811, 838–39 (Iowa 2016). Given the very high stakes, we declined to allow life without the possibility of parole to be imposed by a trial court through what would necessarily be a highly inaccurate and unreliable case-by-case assessment. *Id.* at 839.

The question in this case for the purpose of the relatively narrow constitutional question presented is whether a district court can, with any degree of reliability, determine which offending children who are thirteen years of age are not likely to be rehabilitated by age eighteen. While *Sweet* teaches us to exercise great caution before making broad declarations about future behavior, the issue in this case is different from *Sweet* in three critical respects.

First, the nature of the prediction required under the statute, though difficult, is less problematic than in *Sweet.* The question of determining which child will need rehabilitative services after five years of juvenile rehabilitation is at least arguably less troublesome than predicting who will ultimately be found to be incorrigible or irredeemably corrupt after full character development and maturity. While there is a professional consensus among psychiatrists that accurate, long-term assessment of juveniles is impossible, there is no such consensus on the inability to assess those who need relatively short-term rehabilitative services. *See id.* at 838–39 (noting that professional psychologists disclaim the ability to accurately predict which juveniles will be incapable of rehabilitation).

Second, the statute contains a look-back provision. Iowa Code § 907.3A(2). As a result, the consequences of an initial determination that a child will be treated as a youthful offender does not eliminate a timely second look but, in fact, embraces it. Prior to the second look, the

child will be in the hands of juvenile authorities charged with providing appropriate services and not in the hands of adult correctional officials meting out punishment. *Id.* § 907.3A(1). The second-look feature of the statute thus provides a critical check on the potential of arbitrary and irrational imposition of incarceration on a child. The statute thus does not provide for automatic transfer into adult court, an approach that would be constitutionally suspect because of the absence of an individualized determination under *Miller* and *Lyle* principles.

Third, the consequence of the determination that a child is a youthful offender is less consequential than in *Sweet.* In *Sweet,* the consequence was incarceration for life with no meaningful opportunity to show rehabilitation and maturity. 879 N.W.2d at 840 (Cady, C.J., concurring specially). Here, a youthful offender, even if ultimately subject to a criminal sentence, is not exposed to a mandatory minimum adult sentence because of our ruling in *Lyle* barring the mandatory imposition of minimum sentences for children. As a result, the consequence of being found to be a youthful offender and ultimately subject to a criminal penalty does not lead to an arbitrary and irrational imposition of an adult mandatory minimum sentence on a child.

Yet, it must be recognized that transfer statutes may ultimately pose certain risks. For instance, a youth who is ultimately incarcerated may lack access to resources sufficient to provide a reasonable means to achieve maturity and rehabilitation. *See Holt v. Sarver,* 309 F. Supp. 362, 379 (E.D. Ark. 1970) ("The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation."), *aff'd* 442 F.2d 304 (8th Cir. 1971); Beth Caldwell, *Creating Meaningful Opportunities for*

*Release:* Graham*,* Miller *and California's Youth Offender Parole Hearings*, 40 N.Y.U. Rev. L. & Soc. Change 245, 286 (2016) (emphasizing that access to rehabilitative programs are essential to providing juvenile offenders a meaningful opportunity for release); Sally Terry Green, *Realistic Opportunity for Release Equals Rehabilitation: How the States Must Provide Meaningful Opportunities for Release*, 16 Berkeley J. Crim. L. 1, 26 (2011) (providing education and treatment programs "comply with *Graham*'s mandate for meaningful opportunity for release"); Elizabeth Scott et al., *Juvenile Sentencing Reform in a Constitutional Framework*, 88 Temp. L. Rev. 675, 712 (2016) [hereinafter Scott] ("[A] meaningful opportunity to reform requires a correctional setting that promotes healthy psychological development."). That, however, is not so much a categorical challenge to the Iowa transfer statute as it is a fact-based challenge to conditions of incarceration.

Although the statute approaches the border of constitutionality, in light of its limiting features, I am not prepared to say, at least at this time, that the statute is categorically infirm in this case under article I, section 17 of the Iowa Constitution at least as applied to thirteen-year-old children. The lower the age of the child, of course, the greater the risk of crossing the constitutional line, and it may well be that at age thirteen we are very close to it. Nonetheless, at present, I am inclined not to strike it down on the grounds that the implementation of the statute with respect to thirteen-year-olds is so irrational as to categorically amount to cruel and unusual punishment under article I, section 17 of the Iowa Constitution. Instead of categorically striking down the statute, I think the better course is to permit challenges on an as-applied basis. No as-applied challenge is raised in this case. I would revisit the issue, however, if in practice, application of *Miller* and *Lyle*

principles on discretionary decisions under the statute prove arbitrary, inconsistent, or unworkable.

### III. Challenges to District Court Sentencing.

**A. Awareness of Sentencing Options.** The first issue is whether the district court recognized the breadth of its discretion under the applicable statute. If the district court did not recognize the scope of its discretion, a remand for resentencing is required. *State v. Thomas*, 547 N.W.2d 223, 226 (Iowa 1996) (per curiam); *State v. Sandifer*, 570 N.W.2d 256, 257 (Iowa Ct. App. 1997). The defendant bears the burden of showing that the district court was unaware of its discretion to impose a particular sentence. *State v. Ayers*, 590 N.W.2d 25, 29 (Iowa 1999).

Under the statute, the district court has several options for disposition of a youthful offender—

> [T]he court may continue the youthful offender deferred sentence or enter a sentence, which may be a suspended sentence. . . . [I]f the district court either continues the youthful offender deferred sentence or enters a sentence, suspends the sentence, and places the youthful offender on probation, the term of formal supervision shall commence upon entry of the order by the district court and may continue for a period not to exceed five years. If the district court enters a sentence of confinement, and the youthful offender was previously placed in secure confinement by the juvenile court under the terms of the initial disposition order or any modification to the initial disposition order, the person shall receive credit for any time spent in secure confinement.

Iowa Code § 907.3A(3).

At the hearing on sentencing, the district court made extensive comments. The commentary twice affirmatively stated that the court believed the choice was between incarceration and some type of *street* probation. The district court said,

> So, simply stated, I have two options at this point in time. One is some type of street probation and the other would be a term of incarceration . . . .

Then, after observing the statute was "not particularly well drafted," the district court declared, "I've got probation on the one hand or I've got an indeterminate term not to exceed 50 years on the other hand." There is nothing in the record to show that these affirmative statements regarding limited options were based on anything other than the district court's view of the statute.

The statute, however, authorized the district court to defer or suspend the sentence and place the defendant on probation, with the level of supervision to be determined under section 901B.1 by the district department of corrections. *Id.* § 907.3A(3); *id.* § 901B.1. Section 901B.1 provides for a corrections continuum of varying levels of restrictiveness, including community-based and residential treatment facilities. *Id.* § 901B.1(1)(*c*)(1). Similarly, section 907.3A(3) provides that the district court could have deferred or suspended the sentence and placed Crooks on probation with such terms and conditions that it chose, including commitment to an alternate jail facility or a community-based correction residential treatment facility. *Id.* § 907.3A(3).

The district court, twice, stated on the record that the choices were "street probation" or incarceration. Nothing in the transcript of the sentencing or dispositional hearing indicates that the district court understood it had the possibility of confining Crooks under the corrections continuum of Iowa Code section 901B.1 and that such confinement could include a residential treatment facility or community-based correction facility. Indeed, the entire discussion of the district court on sentencing suggests that it considered only two options, street probation or incarceration. For instance, the district court stated, "I

don't believe it's appropriate to release you on probation" as driving the court into a sentencing option without considering other dispositions.

It may be, of course, that the district court was, in fact, subjectively aware of the other options, but we can only proceed by analyzing the affirmative statements made on the record in this case. The record suggests the district court believed it had two stark choices and not a continuum of choices. I would thus remand for resentencing. *See Thomas*, 547 N.W.2d at 225 (noting it would be an abuse of discretion in sentencing if the district court was unaware of its discretion in imposing sentencing options); *Sandifer*, 570 N.W.2d at 257 (explaining the record must reveal the sentencing court in fact exercised discretion in regard to the range of sentencing options).

**B. Consideration of *Lyle* Factors.** The next question is whether the court abused its discretion in sentencing Crooks. Under our caselaw, the district court must consider any mitigating factors. *See, e.g.*, *State v. Propps*, 897 N.W.2d 91, 102 (Iowa 2017); *State v. Witham*, 583 N.W.2d 677, 678 (Iowa 1998) (per curiam); *State v. Draper*, 457 N.W.2d 600, 605 (Iowa 1990).

We have repeatedly said "children are constitutionally different from adults for purposes of sentencing." *Lyle*, 854 N.W.2d at 395 (quoting *Miller*, 567 U.S. at 471, 132 S. Ct. at 2464); *see also Propps*, 897 N.W.2d at 99; *State v. Ragland*, 836 N.W.2d 107, 119 (Iowa 2013). The differences include "distinctive (and transitory) mental traits and environmental vulnerabilities," *Miller*, 567 U.S. at 473, 132 S. Ct. at 2465, including a "lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile's character," *State v. Null*, 836 N.W.2d 41, 74 (Iowa 2013); *see also Sweet*, 879 N.W.2d at 832–33; *Ragland*, 836 N.W.2d at 115 n.6.

We have emphasized that the constitutionally significant distinction between adults and children is applicable to all crimes, not just some crimes. *Sweet*, 879 N.W.2d at 831; *Lyle*, 854 N.W.2d at 399; *Null*, 836 N.W.2d at 71.[10]

As noted by the leading recognized authorities in the field, the developmental principle that children are constitutionally different has broad application. *See* Scott, 88 Temp. L. Rev. at 707–12 (urging broad application of developmental principle that children are different and citing *Lyle* as example). The principle is applicable to other sanctions and not just the severe sanctions discussed in the cases of the United States Supreme Court. *Id.* at 707. Indeed, the principle that children are different should inform "policies regulating the sentencing of juveniles whenever they are dealt with in the adult system." *Id.* It makes no sense at all to say, for instance, that the mitigating characteristics of youth apply only for minimum sentencing and not, for instance, for discretionary sentencing for a term of years. *See* Barry C. Feld, *The Youth Discount: Old Enough to Do the Crime, Too Young to Do the Time*, 11 Ohio St. J. Crim. L. 107, 147 (2013). The majority correctly finds that the features of children described in *Lyle* and our other juvenile cases are mitigating factors that must be considered in any and all contexts involving discretionary sentencing of defendants who committed crimes

---

[10]We have repeatedly applied the principle that children are constitutionally different in factual settings beyond *Roper*, *Graham*, and *Miller*. In *Null*, we applied the children-are-different principle in the context of aggregate sentencing. 836 N.W.2d at 73. In *Lyle*, we applied the children-are-different principle to categorically strike down mandatory minimums. 854 N.W.2d at 400. In *Sweet*, we applied the children-are-different principle to categorically strike down life-without-the-possibility-of-parole sentences. 879 N.W.2d at 839.

as children. This makes sense in a criminal justice system where culpability is a cornerstone of proportional punishment.[11]

The remaining question is whether we should require a district court to make specific findings regarding consideration of the mitigating factors of youth when sentencing children in adult court. We have required such specific findings in the context of the case-by-case determination of whether a sentencing court should impose an adult minimum sentence on a child offender. *State v. Seats*, 865 N.W.2d 545, 557 (Iowa 2015); *Null*, 836 N.W.2d at 71, 74. We have stated that *Miller* requires "more than a generalized notion of taking age into consideration as a factor in sentencing." *Lyle*, 854 N.W.2d at 402 n.8 (quoting *Null*, 836 N.W.2d at 74). We require consideration of

> (1) the "chronological age" of the youth and the features of youth, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the "family and home environment" that surrounded the youth; (3) "the circumstances of the homicide offense, including the extent of [the youth's] participation in the conduct and the way familial and peer pressures may have affected [the youth]"; (4) the "incompetencies associated with youth—for example, [the youth's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the youth's] incapacity to assist [the youth's] own attorneys"; and (5) "the possibility of rehabilitation."

---

[11]At the district court, Crooks argued that the imposition of a fifty-year prison term went against the common law tradition that young children could not form intent and that the sentence "would run counter to the recent scholarly literature on the subject of juvenile punishment, and which literature the Iowa Supreme Court relied upon in its recent cruel and unusual punishment cases dealing with juvenile offenders." Crooks further cited *Graham v. Florida* as outlining the features of youth to be considered in sentencing, namely their lack of maturity, social development, and risk analysis ability, as well as their susceptibility to familial and peer pressure. 560 U.S. 48, 68, 130 S. Ct. 2011, 2026 (2010).

*Seats*, 865 N.W.2d at 570 (alterations in original) (quoting *Ragland*, 836 N.W.2d at 115 n.6); *see also Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468.

The requirement of specific findings on mitigating factors in the minimum-sentencing context serves three purposes. It ensures that the mitigating *Lyle* and *Miller* factors of youth have been considered, that the *Lyle* and *Miller* factors are treated as mitigating and not aggravating factors, and that the heinous character of the crimes has not, as the United States Supreme Court has cautioned, overwhelmed the *Lyle* and *Miller* factors. *Roper v. Simmons*, 543 U.S. 551, 573, 125 S. Ct. 1183, 1197 (2005).

It is true that the context of this case is not identical to that faced by courts considering minimum sentences. A minimum sentence is an all-or-nothing proposition—either the adult minimum sentence applies or it does not. Further, when an adult minimum sentence is imposed on a child offender, there is no possibility of revisiting the issue if the predictions of future character development prove wrong.

Yet, in this case, the district court faced a wide range of options with dramatically different consequences on the child offender. As the district court correctly pointed out at the sentencing hearing, the child offender in this case will have the possibility of parole. In that sense, the sentence in this case does not have the highly inflexible character of an adult minimum sentence. But the differences between the available options in this case are truly dramatic and are not less consequential than the imposition of an adult minimum sentence on a child.

Although the context is different, I think the three purposes of requiring specific findings apply here. I do not think it is too much to ask that in these invariably difficult cases, district courts provide a

specific explanation of how the plastic characteristics of youth played into the sentencing in this case. We will thus not be required, on appeal, to peer into an empty box in evaluating how the district court approached this key sentencing consideration. Although it is true that we have said in a pre-*Lyle* case that a sentencing court generally is not required to give reasons for rejecting particular sentencing options, *see State v. Loyd*, 530 N.W.2d 708, 713–14 (Iowa 1995), we have announced an exception to that rule in our juvenile cases to ensure that sentencing of child offenders occurs within constitutional guardrails, *see Seats*, 865 N.W.2d at 557; *Null*, 836 N.W.2d at 71, 74. I would apply that concept here as well.

## IV. Conclusion.

For the above reasons, I would vacate the sentence of the district court and remand the case to the district court for further proceedings.

Wiggins and Hecht, JJ., join this concurrence in part and dissent in part.