# IN THE SUPREME COURT OF IOWA

No. 14–1242

Filed April 14, 2017

**STATE OF IOWA,**

    Appellee,

vs.

**YARVON NATHANIEL RUSSELL,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

The State seeks further review after the court of appeals reversed the defendant's conviction based on one of three alternative theories of guilt lacking substantial evidence. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Darrel Mullins, Assistant Attorney General, and John P. Sarcone, County Attorney, for appellee.

**APPEL, Justice.**

This case is a companion to *State v. Shorter*, ___ N.W.2d ___ (Iowa 2017). On appeal, Yarvon Russell asserted there was insufficient evidence to support his conviction based on principle, aiding and abetting, or joint criminal conduct theories in connection with the death of Richard Daughenbaugh. Russell argued that if there was insufficient evidence on joint criminal conduct, but sufficient evidence on the other two theories, his conviction should be reversed. *See State v. Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006). Russell additionally contended that his attorney provided ineffective assistance of counsel for failing to object to the identification testimony of Monica Perkins as going beyond the scope of the minutes of testimony. Finally, Russell asserted that the district court erred in admitting prior inconsistent testimony of a minor witness, T.T., who on direct examination testified that she did not remember the events or her prior inconsistent statements. Russell similarly asserted that testimony from a police detective that the minor witness identified Russell in an unsworn prior statement as "kicking" Daughenbaugh was inadmissible hearsay.

We transferred the case to the court of appeals. The court of appeals reversed Russell's conviction on the ground that there was insufficient evidence to support a joint criminal conduct instruction. We granted further review. For the reasons expressed below, we vacate the judgment of the court of appeals and affirm Russell's conviction.

## I. Facts and Background Proceedings.

**A. Overview.** Kent Tyler, Russell, James Shorter, and Leprese Williams were charged with first-degree murder in connection with the death of Richard Daughenbaugh. Tyler was tried separately from Russell, Shorter, and Williams. At the trial of the three codefendants, a

jury convicted Russell and Shorter of second-degree murder. Williams, however, was acquitted.

The evidence introduced at the trial of Russell, Shorter, and Williams was described in *Shorter*, ___ N.W.2d ___, and need not generally be repeated here. With respect to the identification of Russell as a perpetrator of the crime, B.B., a seventeen year old, placed Russell in the crowd that assembled around Daughenbaugh. Monica Perkins testified that Russell "stomped" Daughenbaugh. L.S., a fifteen year old at the time of the murder, however, did not see Russell participating in the attack. The jury was instructed on theories of liability as a principle, liability as an aider and abettor, and liability through joint criminal conduct. The jury returned a general verdict of guilty of second-degree murder.

**B. Testimony of T.T. and Youngblut.**

1. *Introduction.* This case differs from *Shorter* because Russell challenges the admission of testimony at trial from T.T. and Detective Bradley Youngblut. T.T., a juvenile, was at the scene of Daughenbaugh's attack on August 24–25, 2013. On August 27, T.T. was interviewed by police, including Youngblut. During the interview, T.T. identified Russell as a person who was "kicking" Daughenbaugh. She later testified as a witness at Tyler's trial.

T.T. was deposed in connection with the trial of Russell and Shorter. During her deposition, T.T. repeatedly stated that she did not remember who knocked Daughenbaugh to the ground or who kicked him when he was on the ground. She acknowledged that she was interviewed by the police after the incident but did not remember what she said to them.

4

The State called T.T. as a witness at the codefendants' trial. At trial, however, T.T. repeatedly stated that she did not remember events surrounding the attack or what she told police on August 27. Because of her "I don't remember" testimony at trial, the State sought to introduce evidence of T.T.'s prior statements to the police through impeachment of T.T. and through the testimony of Youngblut. The district court allowed the impeachment and testimony. Russell challenges the admission of T.T.'s out-of-court statements as hearsay.

2. *Pretrial motions in limine.* Prior to trial, Russell filed two motions in limine. He argued that "[s]tatements made to law enforcement officers were made outside court" and were hearsay. He further asserted that when a witness's prior out-of-court statements were not under oath and the witness could not remember the events or what he or she said to law enforcement officers, the State is precluded from using the substantive content of the statements under *State v. Gilmore,* 259 N.W.2d 846, 857 (Iowa 1977).

The State responded by arguing that under *State v. Turecek*, prior inconsistent statements could be used to impeach a witness when the witness was not called for the primary purpose of gaining admission of hearsay. 456 N.W.2d 219, 225 (Iowa 1990). The State further argued that prior inconsistent statements might be used to refresh a witness's recollection under Iowa Rule of Evidence 5.803(5) (2014). Finally, the State noted that to the extent the prior statements were made under oath, such statements were admissible under Iowa Rule of Evidence 5.804(*a*)(3). Prior to trial, the district court reserved ruling on the motions in limine related to the substantive use of hearsay statements made to police investigators.

3. *Initial hearing regarding appointment of counsel.* The State elected to call T.T. as a witness at Russell's trial. Prior to her testimony in the Russell trial, the prosecution advised the court that T.T. or her relatives indicated T.T. wanted a lawyer. As a result, the district court held a hearing outside the presence of the jury.

While T.T. denied seeking a lawyer, T.T.'s mother told the court that T.T. was "kind of confused so I suggested that she get a lawyer." The district court asked T.T. whether she understood that she would be questioned by the lawyers and asked to give testimony under oath. T.T. said she understood. Under the circumstances, the district court declined to appoint counsel for T.T.

4. *Initial trial testimony of T.T. and appointment of counsel.* The State called T.T. as a witness. T.T. remembered arriving at the scene after dark and that she arrived with her cousin and friends. She stated there were "a lot" of people present. She stated Tyler and Russell were there and Shorter was "down by the river." T.T. also made courtroom identifications of Russell and Shorter.

At this point, the prosecution turned to examining T.T. specifically about the attack on Daughenbaugh. T.T. testified that she remembered seeing Daughenbaugh arrive. She also recalled that Daughenbaugh walked by her cousin and bumped into her and that Daughenbaugh ended up on the ground.

At this point, T.T. testified that she did not remember what happened after Daughenbaugh was on the ground. She repeatedly testified she did not remember how Daughenbaugh got to the ground and did not remember what happened to him on the ground.

T.T. further testified that she did not remember talking to police after the attack. When the prosecutor asked whether T.T. had testified

before under oath in the Tyler case, she answered, "I guess." When pressed again whether she had testified under oath before about the attack on Daughenbaugh, T.T. declared, "I don't know what you are talking about."

At this point, the State asked for the jury to be excused and once outside the presence of the jury, recommended that a lawyer be provided for T.T. According to the State, T.T. might have perjured herself already, but in any event, T.T. should be allowed to "consult with a lawyer before we go any further." The district court agreed, counsel was appointed, and court adjourned for the remainder of the day.

5. *Further hearing outside the presence of the jury regarding T.T.'s testimony.* The following Monday morning, T.T., though still under subpoena, did not appear. The district court issued a bench warrant for her arrest and continued the trial until that afternoon. When T.T. appeared in the courtroom, the district court held a hearing outside the presence of the jury.

The State asked T.T. a series of questions about her memory of the events of August 24–25. When asked by the State if she saw something happen to Daughenbaugh when he was on the ground, whether she saw somebody punch him, whether she testified about the matter previously under oath, and whether she gave a statement to police, T.T. repeatedly declared, "I don't remember."

The State next confronted her with a page from the transcript of Tyler's trial where T.T. testified that "somebody punched" Daughenbaugh. T.T. declared that the transcript did not refresh her recollection and repeated that she did not remember her testimony in the Tyler trial.

The State further asked T.T. about statements made to detectives at the Des Moines police station on August 27, a few days after Daughenbaugh's death. She stated she remembers talking to detectives, but did not remember looking at a picture on Facebook or identifying people in the picture for police. She was able to provide in-court identifications of her ex-boyfriend, another person, and Russell from the Facebook photograph. When asked if she had told detectives on August 27 that Russell was kicking the man in the parking lot, T.T. repeatedly stated, "I don't remember."

The State then confronted T.T. with passages from the written record of her August 27 interview:

> Q: And Detective Youngblut says, "During our previous interview before you ever looked at the Facebook or Instagram or Twitter or any of that stuff, you described a yellow shirt, red hat. Is that the same outfit you saw [on] the person that you saw kick the victim?"
>
> And what was your answer? You said, "Yes, he kicked him," right? Right? A: Yes, that is what it says right there.
>
> Q: That is what you said on August 27 of 2013 to Detective Youngblut, right? A: Yes.
>
> Q: Again on page six of 11, Detective Youngblut confirms for you, "That's the person you know as Vonnie Splurge?" And you said, "Yeah," is that correct? A: Yeah, it says right there.
>
> Q: On page seven of 11, you say at the end of your answer, "And then I saw Vonnie kick him and I saw the man with the red hat and the black shirt jump on his face," right? A: Yes.
>
> Q: That's what you said in August of 2013 but it is your testimony today that you don't even remember saying that then? A: No, I don't remember.

The State then asked T.T. a series of questions regarding telling the officers in August about a woman with red hair who eventually called police, but T.T. testified repeatedly that she did not remember.

After making the above record, the State argued that T.T. had made herself unavailable in the proceedings and that the State could impeach her under *Gilmore*, 259 N.W.2d 846. The State proposed to admit portions of her deposition, to ask T.T. questions using those pieces of the police interview which she claimed she could not remember, and to call Detective Youngblut who would testify about the August 27 statements made by T.T. The State further asserted that a prior statement of a witness is admissible if it is one of identification of a person made after perceiving them. *See* Iowa R. Evid. 5.801(*d*)(1)(C).

Russell argued that under *Gilmore*, the only issue upon which T.T. could be impeached was whether she in fact remembered her prior statements to police. Further, Russell argued that admission of the actual prior statements would be excludable as unduly prejudicial under Iowa Rule of Evidence 5.403. Russell argued that under Iowa Rule of Evidence 5.801(*d*)(1)(C), only identification of a person is not hearsay, but anything about the person after identification is inadmissible. In short, the identification of Russell from the photograph could be admitted, but not T.T.'s statement that Russell was one of the persons who was kicking Daughenbaugh.

The district court held that it would admit deposition testimony under Iowa Rule of Evidence 5.804(*b*)(1). The district court further found that the State had laid appropriate foundation under *Gilmore* for the witness to be shown the statement that purported to be inconsistent with the material fact and not just lack of memory. The district court also ruled that testimony about an identification of a person made after perceiving the person would be admissible as long as an adequate foundation was laid under Iowa Rule of Evidence 5.801(*d*)(1)(C).

6. *Continued testimony of T.T. before the jury.* T.T. resumed her testimony before the jury. The State asked her whether she remembered seeing a woman with red hair at the scene or talking to police, which T.T. repeatedly answered with, "No, I don't remember." The State then impeached T.T. with her prior statement. T.T. was presented with a "big stack of papers" and questioned as follows:

> Q: Page seven. Did you tell the police, "And then the lady with the red hair, she looked way, way over, she called the police," do you remember that? A: I don't remember.

> Q: Do you recognize that as being your statement of August 27, 2013? A. I don't remember.

> Q: Page 13. Do you remember telling the police, "I got in my car. I think some people threw her phone in the water"? Do you remember that? A: I don't remember.

> . . . .

> Q: During one of your interviews with the police, did you look at some pages and some photographs on Facebook? A: I don't remember.

> Q: I am going to show you what's been marked State's Exhibit 56. You have seen that picture before, have you not? A: I noticed my ex-boyfriend in there.

> Q: You have seen this picture before, right? A: Yeah.

> Q: And you have identified people in that picture before, haven't you? A: Yeah.

The State asked T.T. to identify persons from the photograph. T.T. identified several persons from the photo, including Russell. T.T. then made an in-court identification of Russell as being the same person she identified from the photo.

The State then repeatedly asked T.T. if she remembered identifying persons in the photo to police. T.T. repeatedly responded, "I don't remember." The State then directed T.T.'s attention to the pages of a

document describing questions asked by police and her answers. The questioning continued:

> Q: On page six again the police confirm with you that person in the picture is Vonnie Splurge or Yarvon Russell, right? A: Yes.
>
> Q: On page seven the police talked to you about Vonnie as being the man in the red hat—the man—what Vonnie was doing to the white gentleman on the ground, right? A: Yeah.
>
> Q: But you don't remember that at all? A: No.
>
> Q: You don't remember seeing it? A: No.
>
> Q: And you don't remember telling the police this information? A: I don't remember.

7. *Testimony of Detective Youngblut.* The State also introduced the testimony of Detective Bradley Youngblut. Youngblut interviewed T.T. three times over the course of the afternoon of August 27, a couple days after the assault. Youngblut testified that T.T. was presented with a photograph of several persons from Facebook that were posted to a social website to determine whether any people that might be witnesses or suspects were captured in any of the photos. Youngblut testified as follows:

> Q: The gentlemen that we see in position number three [in the Facebook photograph] with the red hat and multi-colored shirt on, was she able to identify that person to you? A: Yes.
>
> Q: Who did she identify that as being? A: Yarvon Russell.
>
> . . . .
>
> Q: Did [T.T.] identify to you when you spoke with her about this picture what, if any, participation any of those individuals had in the beating of Mr. Daughenbaugh? A: Yes she did.

Q: What did she tell you? A: She described the outfit worn by Yarvon Russell during her interview and identified him as kicking Mr. Daughenbaugh.

## II. Resolution of Common Issues.

Russell asserts three issues nearly identical to those raised in *Shorter,* ___ N.W.2d ___. For the reasons expressed in *Shorter,* we conclude that there was sufficient evidence to support the verdict and that any erroneous submission of the joint criminal conduct instruction did not undermine the jury's verdict. We also conclude, as in *Shorter,* that Russell's claim of ineffective assistance of counsel for his counsel's failure to object to Perkins's identification testimony cannot be decided on direct appeal and should be addressed in an action for postconviction relief.

## III. Use of Prior Out-of-Court Statements When Witness Asserts Lack of Memory at Trial.

**A. Introduction.** The fighting evidentiary issue is whether the questioning of T.T. by the State or the evidence presented by Detective Youngblut introduced inadmissible hearsay into the record.

The question involves the interplay of various rules of the Iowa Rules of Evidence. With respect to the interrogation of T.T., Iowa Rule of Evidence 5.607 provides that any party may impeach its own witness. A prior inconsistent statement is not hearsay when the witness makes a testimonial statement at trial, is subject to cross-examination, and the prior inconsistent statement was made under oath. *Id.* r. 5.801(*d*)(1)(A). But what if the statements, as here, are not made under oath?[1] May the

---

[1]As originally proposed, Federal Rule of Evidence 801(d)(1)(A) provided that all prior inconsistent statements were substantive evidence and that there was no requirement that the inconsistent statements be made under oath in order to be admitted. 4 Michael H. Graham, *Handbook of Federal Evidence* § 607:3, at 228–29 (7th ed. 2012). Congress narrowed the provision, however, to include only statements given under oath subject to penalties of perjury. *Id.* at 229. We have adopted an approach in

inconsistent statements that are ordinarily excludable as hearsay be admitted to impeach a witness even when the witness purports to have no memory of facts or the prior inconsistent statement? And, to what extent was the testimony of T.T. and Youngblut admissible under Iowa Rule of Evidence 5.801(*d*)(1)(C), which provides that an out-of-court statement is not hearsay if it is "one of identification of a person made after perceiving the person."

**B. Standard of Review.** A district court's decision to admit or exclude evidence is generally reviewed for abuse of discretion. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009). Hearsay rulings, however, are reviewed for errors at law. *Id.* This standard of review extends to determining whether statements come within an exception to the general prohibition on hearsay evidence. *Id.*

Reversal of a ruling which admits or excludes evidence is not necessary unless a substantial right of a party is affected. Iowa R. Evid. 5.103(*a*). When nonconstitutional error occurs, we employ a harmless error analysis. *State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004). We presume prejudice and reverse unless the record affirmatively establishes otherwise. *State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006).

**C. Positions of the Parties.** Russell asserts that the evidence about T.T.'s prior statements is inadmissible under *Turecek*, 456 N.W.2d 219. In *Turecek*, we held that the state is not allowed to call a witness expected to give unfavorable testimony and then attempt to impeach the witness with inadmissible prior inconsistent statements under Iowa Rule of Evidence 5.607. *Id.* at 225. According to Russell, *Turecek* stands for

---

our rules of evidence similar to the federal rule as modified by Congress. *See* Iowa R. of Evid. 5.801(*d*)(1)(A).

the proposition that the state cannot call a witness with the primary purpose of getting into evidence prior inconsistent statements through the guise of impeachment.

In further support of his position, Russell cites *State v. Tracy*, 482 N.W.2d 675 (Iowa 1992), and *State v. Wixom*, 599 N.W.2d 481 (Iowa Ct. App. 1999). In *Tracy*, we rejected an effort by the prosecution to put on the stand and impeach a witness who recanted earlier statements. 482 N.W.2d at 679. In *Wixom*, the court of appeals rejected testimony from officers who testified about a witness's prior statements as "plainly hearsay." 599 N.W.2d at 485.

Applying these principles, Russell argues that the State's effort to impeach T.T., and the testimony of Detective Youngblut, was impermissible. Russell emphasizes that the State knew from T.T.'s deposition that T.T. could not remember what happened to the victim nor could she recall what she told law enforcement officers afterwards. She was obviously a reluctant witness, having failed to appear at both the trial of Tyler and Russell. According to Russell, the State's determination to proceed was for the primary purpose of introducing her prior hearsay statements into the record.

Russell recognizes that *Turecek* applies only if the impeachment evidence is otherwise inadmissible. 456 N.W.2d at 225. Anticipating the State's argument, Russell asserts that the prior inconsistent statements are not admissible under *Gilmore*, 259 N.W.2d 846. In *Gilmore*, we heard a case where the state sought to introduce evidence of prior inconsistent statements to impeach its witness when the witness asserts lack of memory at trial. *Id.* at 850.

Russell concedes that under *Gilmore* and Iowa Rule of Evidence 5.607, any party may impeach its own witness. *Id.* at 852. When the

witness asserts lack of memory, however, Russell asserts that the State cannot introduce the substance of the prior statement. According to Russell, under *Gilmore* the only fact to be impeached is whether the witness remembers the statements made in the prior statement. *See id.* at 854. Under the circumstances, Russell argues that *Gilmore* allows the State to try to make the witness admit that she remembered the underlying facts, but prohibits the State from reading the prior statements into evidence.

Russell also recognizes that under Iowa Rule of Evidence 5.801(*d*)(1)(C), a prior identification of a witness is not hearsay. Russell argues, however, that the testimony of T.T. does not go to his identity, but instead to the underlying facts of the crime, namely, that Russell kicked the victim.

The State first counters Russell's *Turecek* claim by asserting that T.T.'s testimony was identification evidence under Iowa Rule of Evidence 5.801(*d*)(1)(C), defining such evidence as not hearsay. According to the State, T.T.'s identification testimony is admissible for any purpose because she testified at trial and was subject to cross-examination.

The State further contends that T.T.'s testimony is admissible under *Gilmore*, 259 N.W.2d 846. According to the State, T.T. was warned about her prior statements and was afforded an opportunity by the State to explain them. The State argues that T.T.'s prior statements to police and in her deposition went directly to facts in issue: whether she saw Russell participating in the assault of Daughenbaugh. Nothing in *Gilmore*, according to the State, limits the use of her prior statements to impeachment.

Finally, the State contends that the testimony of T.T. was not offered solely or primarily for the purpose of introducing the prior

inconsistent statement and that as a result the *Turecek* rule does not apply. *See* 456 N.W.2d at 225. The State points out that T.T. testified at trial that people were jumping on Daughenbaugh and that Daughenbaugh struggled to defend himself. T.T., according to the State, thus testified that Daughenbaugh was conscious initially while on the ground before he received subsequent blows.

**D. Discussion.**

1. *Application of* Turecek. Russell urges that the primary purpose of calling T.T. to the stand was to seek to impeach her with inadmissible hearsay through prior inconsistent statements not made under oath.[2] The State contends that under *Turecek,* the court should examine the proffered testimony of a witness as a whole in making the determination of whether the State has called the witness as a subterfuge to gain the admission of otherwise inadmissible testimony. *See id.* at 225. There is authority for this proposition, although some cases suggest a different test. *See generally* 7 Laurie Kratky Doré, *Iowa Practice Series*™*, Evidence* § 5.607:1, 560–61 n.3 (2016–2017 ed.) [hereinafter Doré] (discussing subterfuge theory in *Turecek* and related cases); 4 Michael H. Graham, *Handbook of Federal Evidence* § 607:3, 230–32, 234–35 (7th ed. 2012) (discussing primary-purpose test and other potential approaches).

But even accepting the State's approach to *Turecek,* it is hard to see what the State sought to accomplish by calling T.T. as a witness other than to gain admission of T.T.'s prior statement that Russell had kicked Daughenbaugh through an impeachment effort. The State knew

---

[2]Russell does not challenge the admission of T.T.'s out-of-court statements as a violation of the Iowa or Federal Confrontation Clause. The United States Supreme Court, over a dissent, rejected such a claim under the United States Constitution in *United States v. Owens*, 484 U.S. 554, 559–60, 108 S. Ct. 838, 842–43 (1988).

from T.T.'s deposition, and from testimony outside the presence of the jury at Russell's trial, that T.T. was going to testify that she did not remember what happened to Daughenbaugh after she saw him on the ground. She was further going to testify that she did not remember what she told police during her August interviews. The bulk of the State's examination of T.T. was oriented toward impeaching her with her prior statements.

Based on our review of T.T.'s testimony, we conclude that the primary purpose of calling T.T. was to impeach her with her prior statements—and get into the record her prior declaration that Russell kicked Daughenbaugh—and not to establish other facts. Indeed, she offered very little evidence into the record beyond testifying that she arrived at the scene on the night in question, saw Daughenbaugh brush past her cousin in an offensive way, and then saw Daughenbaugh on the ground. This testimony was of little use in prosecuting Russell for the crime.

The remaining question is whether any of the inconsistent statements identified in the impeachment of T.T. by the State were admissible on any grounds. The *Turecek* rule is a shield designed to prevent the introduction of otherwise inadmissible evidence, but it cannot be used to prevent the State from using admissible evidence to impeach a witness. *See* 456 N.W.2d at 225. Prior statements of a witness that are admissible as substantive evidence may be freely employed to impeach a witness on direct examination. *State v. Nance*, 533 N.W.2d 557, 561 (Iowa 1995). We must therefore turn to the theories advanced by the State regarding the admissibility of T.T.'s prior statements and the testimony of Detective Youngblut.

2. *Admission under* Gilmore. The State suggests that the hearsay statements of T.T. made to the police on August 27 are admissible impeachment under *Gilmore,* 259 N.W.2d 846. In *Gilmore,* we considered the proper manner of impeaching a witness who testified that he did not remember the underlying facts of a crime. *Id.* at 850. In *Gilmore,* we stated that the witness can be examined about the existence of a prior statement in an effort to refresh the witness's recollection. *Id.* at 854.

As stated in *Gilmore,* it is clear that a party may impeach its own witness. *Id.* at 852; *see also* Iowa R. Evid. 5.607. In *Gilmore,* we held that

> where a witness makes a testimonial statement and then does not remember a prior inconsistent statement he made dealing with the same facts or is evasive as to that statement . . . either party [may] introduce the prior inconsistent statement into evidence [if certain foundation prerequisites are met].

*Id.* at 857. We further explained, however, that there was "no testimonial statement" when the witness did not remember the underlying facts that were the subject of the prior statement. *Id.* When a witness testifies that he or she does not remember the underlying facts, the only subject to be impeached is the witness's memory or ability to recollect. *Id.* As a result, "[t]he State was free to try to make her admit she remembered the underlying facts bearing on the issue . . . but was not free to read into evidence the prior statement." *Id.* We thus conclude that *Gilmore* does not provide a basis for admission of the prior statements made by T.T. in this case.

3. *Admission as prior identification under Iowa Rule of Evidence 5.801(d)(1)(C).* The State further contends evidence that T.T. told police that Russell kicked Daughenbaugh—through both cross-examination of

T.T. and through the testimony of Detective Youngblut—was a nonhearsay identification of Russell under Iowa Rule of Evidence 5.801(*d*)(1)(C). This rule at the time of trial provided that testimony at trial is not hearsay if it relates to "identification of a person made after perceiving the person." *Id.* The requirements under the rule are (1) that the person making the out-of-court identification must testify at trial and thus be subject to cross-examination on the identification, and (2) the statement must have been made after perceiving the person. *State v. Mann*, 512 N.W.2d 528, 535 (Iowa 1994); *see also* Doré, § 5.801(8), at 843–44.

We have applied Iowa Rule of Evidence 5.801(*d*)(1)(C) in few cases. In *Mann*, we held that a police officer could testify that the witness identified the defendant from a mug-shot book prior to trial when the witness testified at trial and was available for cross-examination. 512 N.W.2d at 534; *see also United States v. Thomas*, 41 M.J. 732, 735 (N-M. Ct. Crim. App. 1994) (holding United States military out-of-court identifications rule restricted to identifications conducted in the presence of law enforcement and involving a lineup, showup, or photo array); *Swafford v. State*, 533 So. 2d 270, 276 (Fla. 1988) (holding that "identification of a person after perceiving him" requires the declarant to have just seen the individual either in person or in a photograph).

The record reveals that T.T. was shown Facebook photographs of persons who were in the area of the crime on the evening of August 24–25. T.T. was given a photograph from which to "perceive" Russell. She identified Russell as one of the persons "kicking" Daughenbaugh. We think it clear that her identification of Russell as a person kicking Daughenbaugh, based on the Facebook photograph, is nonhearsay under Iowa Rule of Evidence 5.801(*d*)(1)(C). *See Porter v. United States,*

826 A.2d 398, 410 (D.C. 2003) (holding details of the offense admissible along with identification to the extent necessary to make identification understandable to jury); *accord State v. Stratton*, 161 P.3d 448, 450 (Wash. Ct. App. 2007). Given the factual record, the availability of T.T. for cross-examination, and our approach in *Mann*, we find the court properly admitted the testimony of Youngblut regarding T.T.'s prior identification of Russell. *See* 512 N.W.2d at 534.

We also find no infirmity in the prosecution's interrogation of T.T. in connection with the identification. As stated above, her prior identification is admissible, thereby avoiding a *Turecek* or *Gilmore* problem. Even if we were to extend *Turecek* to include occasions in which the prosecution calls a witness solely to impeach her based on a prior admissible identification, such error would obviously be harmless in light of the testimony of Youngblut. While under *Gilmore*, impeachment of a witness with no memory is ordinarily limited, T.T. herself established the foundation for admission of the evidence when she admitted that she provided the prior statement and admitted that she identified Russell, even though she testified that she had no current memory.

Some of the nonidentification impeachment of T.T. may have gone beyond the limits of *Gilmore* and was inadmissible as nonhearsay or under any other exception to the hearsay rule. For instance, the impeachment of T.T. based upon the conduct of the woman with red hair—a reference to Monica Perkins—is not identification testimony. Nonetheless, this testimony was merely cumulative of the evidence at trial and was therefore harmless.

**IV. Conclusion.**

For the above reasons, the decision of the court of appeals is vacated and the judgment of the district court is affirmed.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**