# IN THE COURT OF APPEALS OF IOWA

No. 18-2081
Filed February 3, 2021

**STATE OF IOWA,**
  Plaintiff-Appellee,

**vs.**

**DEANTAY DARELLE WILLIAMS,**
  Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Bradley J. Harris, Judge.

A defendant appeals the judgments and sentences imposed for two counts of sexual abuse following a jury trial and for one count of sexual abuse and one count of possession of marijuana with intent to deliver following a guilty plea. **AFFIRMED.**

Philip B. Mears of Mears Law Office, Iowa City, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

Deantay Williams appeals four judgments and the overall sentence imposed in two separate criminal cases. The first case involves two convictions for sexual abuse in the third degree following a jury trial. The second case stems from his guilty pleas to two more crimes—sexual abuse in the third degree and possession of marijuana with intent to deliver—that Williams committed while free on bail. Challenging the jury's verdicts, Williams claims the State presented insufficient proof the two fifteen-year-old witnesses were incapacitated under Iowa Code section 709.1A (2012). Williams also alleges various errors or omissions by his trial attorney and the sentencing judge. Meanwhile, the State seeks reversal of the district court's decision to merge four guilty verdicts into two counts for sentencing.

Despite some inconsistency between the witnesses' contemporaneous reports and their trial testimony, we find substantial evidence supports the jury's verdicts. We reject Williams's claims that his attorney was remiss in not moving to suppress under Iowa Code section 232.11 and in not objecting to the State's alleged breach of the plea agreement. But his claim that counsel was ineffective in letting him plead guilty without warning of the potential for consecutive sentences would be better litigated in a possible postconviction-relief (PCR) action. As for his other complaints on sentencing, we find the district court considered appropriate factors. Finally, because the State did not cross-appeal or otherwise seek appellate review of the merger rulings, we decline to consider those arguments. Finding no ground for reversal, we affirm the judgments and sentences.

## I.  Facts and Prior Proceedings

Because Williams pursued a pretrial appeal, almost nine years have passed since L.M. and J.K., then both fifteen years old, reported being sexually assaulted by several young men.  *See State v. Williams*, 895 N.W.2d 856, 867 (Iowa 2017) (denying speedy indictment challenge).

In June 2012, Waterloo police responded to an early morning dispatch reporting a possible rape.  Officers found L.M. in Gates Park.  She appeared "groggy" and "lethargic."  L.M. told police she attended a party at a nearby house.  Other partygoers plied L.M. and her friend, J.K., with liquor.  L.M. was wearing only one shoe and left her leggings behind when she fled the basement of that house.  And prompting immediate concern, L.M. said her friend J.K. was still there.  Police raided the house and located J.K. in the basement.  While locating J.K., officers noticed several mattresses on the basement floor, as well as used condoms and condom wrappers.  They also found L.M.'s sandal, a book bag, and a purse.  Officers took both girls to the hospital to be examined.

The night's traumatic end followed a day of "hanging out" with friends.  L.M. and J.K. had been walking down Adams Street, when J.K.'s friend, Taevon Washington, called to her from Cordarell Smith's house.  The girls stopped to talk.  Smith offered them a bottle of liquor.  Without knowing what kind of alcohol was inside, both girls started drinking.  The group moved to a larger gathering at a house on Almond Street.  There, about thirty guests passed around bottles of liquor.  The girls continued drinking.

Later, the girls went for food at a nearby McDonald's.  Then they returned to the Adams Street house and continued partying in the backyard.  Eventually the

girls lost each other in the crowd. J.K. went downstairs with Eric Webster. L.M. stayed in the yard, chatting with Williams for upwards of half an hour. Their conversation ended when another partygoer told L.M. that J.K. was in the basement and wanted to speak to her. L.M. went inside looking for J.K. She testified Smith was standing behind her at the top of the stairs. He was "like butting [her] down the stairs" and "pushing his body against [hers]" to propel her down the stairs. Once in the basement, L.M. saw two mattresses on the floor about a foot apart. She saw J.K. having sex with Webster on one mattress. Because L.M. had seen J.K. and Webster acting friendly earlier that night, she was not surprised to find them having sex. L.M. said it looked like "regular sex."

L.M. testified she approached J.K. to ask if she needed anything. Before receiving an answer, L.M. was pushed onto the other mattress. She recalled Smith ripping off her leggings and underwear. Williams, Washington, and Smith then took turns performing vaginal sex while L.M. tried to push them away and yelled for them to stop. At one point, someone held her down while Smith assaulted her.

Afraid for her own life, L.M. "wanted to get out of there." She sensed an opening when Williams, Smith, and Washington left her and surrounded J.K. on the other mattress. L.M. grabbed her phone and fled the house. She ran to the park where she called her friend Tyrone, whose mother contacted police. During their call, L.M. told Tyrone she took some pills, passed out, and awoke to being raped. When Tyrone found L.M. at the park, she looked "nervous and shaky." Tyrone spent five to ten minutes with her until police took over.

One of those officers, Andrew Naumann, talked to L.M. in the back of his squad car. L.M. told Naumann she "drank from a bottle of Hennessy and passed

out." She suspected there was some kind of drug in the bottle. The officer testified: "She told me that because she doesn't remember falling asleep." L.M. also said that three men had assaulted her. Another officer testified that L.M. said she "had been laced," meaning someone had given her drugs without her knowledge. And of most urgency, L.M. told the officers J.K. was still in the house, prompting a raid.

Officers found J.K. sitting on a mattress in the basement, her arms wrapped around her knees, her head down. She appeared "[f]rightened. Not sure what was going on. Disoriented, dazed, confused, crying, tears in her eyes." She asked: "Where is my friend at, I don't remember what happened, and I don't know where I'm at."

J.K.'s testimony, more than six years later, was slightly different. She testified the night of the Adams Street party was the first time she had been intoxicated. She said she "felt weird. Felt sick. Dizzy." She did not know what kind of alcohol she drank, only that it was clear liquid in a bottle. She also smoked marijuana that night. J.K. recalled attending the gatherings on Almond Street and Adams Street. But she could not remember going to McDonald's. She testified: "I think I was just drunk. I don't remember." Standing outside the Adams Street house, she felt dizzy and light-headed and took some acetaminophen that Washington handed her.

Later, J.K. lost track of L.M. and searched for her in the crowd outside the house. Eventually, J.K. went inside to use the bathroom. On her way out, Webster told her L.M. was downstairs, so she followed him to the basement. The basement was dark, and she heard a sound like someone crying. J.K. wondered if it was

L.M., but then she was "getting pushed around, onto the bed." J.K. testified that several males, including Williams, performed sex acts against her while she told them to stop. The prosecutor asked, "Did you feel as though you could have got away at that point?" J.K. responded, "No," and explained she "[c]ouldn't even function." She felt "helpless" like she could "do nothing" for herself. J.K. also testified she did not recall L.M. approaching her while Webster was on top of her.

At the hospital, two sexual-assault nurses examined L.M. and J.K. and administered rape kits. The nurse who examined J.K. said "her behavior was controlled and quiet but . . . sleepy." J.K. told the nurse that she was hanging out with her friend and had a headache. "Someone gave her some pills, and she fell asleep, awaking to someone on top of her." J.K. identified that person as Smith. J.K. gave the following account to the nurse: "[S]he describes her surrounding as a bed in the basement. She could hear her friend screaming but could not see her. Someone was holding her arms, and the perpetrator was yelling at her . . . [t]o shut the fuck up." J.K. told the nurse she "started yelling get off of me." J.K. described the three men who assaulted her. J.K. also recalled passing out and waking up some time later.

The nurse who examined L.M. testified that L.M. said Washington gave her a clear liquid in a bottle to drink. L.M. described the men pulling off her leggings and ripping her underwear followed by the three sex acts. She described crying and telling them to stop. L.M. also reported she "briefly had a lapse of consciousness."

The girls also underwent toxicological testing several hours after leaving the house. L.M. had a blood alcohol content (BAC) of 0.114, well over the legal limit

for driving. J.K.'s BAC was 0.025; she also had marijuana and acetaminophen in her system. The toxicology reports did not show that either girl tested positive for a "date rape" drug, according to the lead investigator.

Before their raid, police stopped Williams as he left the Adams Street house. He agreed to an interview, waived his *Miranda* rights, and submitted to a DNA test. Williams initially denied knowing the girls were in the basement. But eventually he admitted performing sex acts on both of them, insisting it was consensual. The Division of Criminal Investigation (DCI) later matched his DNA profile with samples found at the scene and in the girls' rape kits. The State called DCI criminalist Michael Schmit to testify about those findings. Schmit explained that the lab confirmed seminal fluid and DNA from several sources, including Williams, on the girls' bodies and clothing, as well as on condoms collected from the basement.

Police apprehended Williams and co-defendants, Washington and Smith, in October 2013. The State charged Williams with kidnapping in the first degree, two counts of sexual abuse in the second degree, and two counts of sexual abuse in the third degree. What followed was a complicated procedural history. Williams moved to dismiss the case, alleging the State violated his right to a speedy indictment. When he was unsuccessful, he applied for discretionary review. Our court reversed. *State v. Williams*, No. 14-1793, 2016 WL 146197, at *4 (Iowa Ct. App. Jan. 13, 2016). The State sought further review. Overruling precedent, our supreme court held the State did not violate Williams's right to a speedy indictment and remanded. *Williams*, 895 N.W.2d at 867.

While Williams was free on bond following this court's decision, he acquired two new felony charges: sexual abuse in the third degree, in violation of Iowa Code

section 709.4(1)(b)(3)(d) and possession of marijuana with intent to deliver, in violation of section 124.401(1)(d). With those new matters pending, the original prosecution of co-defendants Williams, Washington, and Smith went to trial in September 2018, more than five years after the events. At the close of trial, the jury considered six charges against Williams and returned the following verdicts:

| | Charge | Victim | Verdict |
|---|---|---|---|
| Count I[1] | Kidnapping first degree | L.M. | Sexual abuse third (general verdict--against the will and incapacitated) |
| Count II | Not submitted to jury | | |
| Count III | Sexual abuse second (by force, aided and abetted by one or more persons) | J.K. | Simple assault |
| Count IV | Conspiracy to commit sexual abuse second | L.M. | Not guilty |
| Count V | Conspiracy to commit sexual abuse second | J.K. | Not guilty |
| Count VI | Sexual abuse third | L.M. | Sexual abuse third (incapacitation) |
| Count VII | Sexual abuse third | J.K. | Sexual abuse third (incapacitation) |

After the jury trial, Williams pleaded guilty to the two new charges. He offered those pleas in November 2018 and went on to sentencing in both cases. At sentencing, the court merged Counts I and VI (involving L.M.), and Counts III and VII, (involving J.K.). The district court sentenced Williams to three consecutive ten-year terms (encompassing two counts of third-degree sexual abuse in the first case and one count of third-degree sexual abuse and one count of possession with intent in the second case). Williams appealed the judgments and sentence.[2]

---

[1] Shading reflects subsequently merged convictions.
[2] The supreme court stayed this case while it considered the applicability of statutory changes relevant to criminal appeals. After resolving those issues, the supreme court transferred this appeal to us.

## II. Scope and Standards of Review

We review a challenge to the sufficiency of the evidence for correction of errors at law. *State v. Keeton*, 710 N.W.2d 531, 532 (Iowa 2006). We review claims of ineffective assistance of counsel de novo. *State v. Harrison*, 914 N.W.2d 178, 18 (Iowa 2018). We often preserve such claims for PCR proceedings where the applicant may develop supporting facts. *State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015). But we may resolve them on direct appeal if the record is adequate.[3] *Id.* We also review constitutional challenges to sentencing de novo. *State v. Seats*, 865 N.W.2d 545, 553 (Iowa 2015). Otherwise review of sentencing is for an abuse of discretion. *State v. Crooks*, 911 N.W.2d 153, 161 (Iowa 2018).

## III. Analysis

### A. Sufficiency of the Evidence

Williams claims the record lacks adequate proof that he committed third-degree sexual abuse (Counts VI and VII) while L.M. and J.K. were incapacitated. *See* Iowa Code § 709.1(2) (defining sexual abuse as engaging in a sex act with a person who is "suffering from a mental defect or incapacity which precludes giving consent"); *see also id.* § 709.4(1)(d) (designating a sex act

---

[3] In 2019, the Iowa legislature amended Iowa Code section 814.6 to prohibit most appeals from guilty pleas. *See* 2019 Iowa Acts ch. 140, § 28. That same legislation amended section 814.7 to bar appellate courts from deciding claims of ineffective assistance of counsel on direct appeal. *See id.* § 31. But our supreme court decided these provisions did not apply to judgments entered before July 1, 2019. *State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019). Because the court entered judgment in November 2018, we may consider Williams's ineffective-assistance claims on direct appeal, if the record is adequate. *See State v. Kuhse*, 937 N.W.2d 622, 627 (Iowa 2020). We may also consider his claims arising from his guilty plea. *See Macke*, 933 N.W.2d at 228.

performed while the other person is incapacitated as sexual abuse in the third degree).[4]

We uphold guilty verdicts if they are supported by substantial evidence. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). Substantial evidence exists when a rational trier of fact would be convinced the defendant is guilty beyond a reasonable doubt. *Id.* In deciding whether a verdict is supported, we view all relevant evidence in the light most favorable to the State. *Id.* Evidence is not substantial if it raises only suspicion, speculation, or conjecture. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016).

We do not determine facts anew because it is "peculiarly the province of the jury" to pass on such questions. *State v. Lowenberg*, 243 N.W. 538, 541 (Iowa 1932). "[T]he jury was free to believe or disbelieve the testimony of the witnesses and to give as much weight to the evidence as, in its judgment, such evidence should receive." *State v. Hunt*, 801 N.W.2d 366, 377 (Iowa Ct. App. 2011). "The very function of the jury is to sort out the evidence and place credibility where it belongs." *Id.*

---

[4] In a decision predating the enactment of section 709.1A, our supreme court explained that this definition of sexual abuse aimed to protect persons who could not give "meaningful 'consent.'" *State v. Sullivan*, 298 N.W.2d 267, 272 (Iowa 1980); *see State v. Farnum*, 554 N.W.2d 716, 721 (Iowa Ct App. 1996) (extending term "incapacity" to "a person rendered unconscious from intoxication"); *see also State v. Lopez*, No. 10-0766, 2012 WL 163232, at *3 (Iowa Ct. App. Jan. 19, 2012) (noting "some overlap exists between the non-consent elements of third-degree sexual abuse in sections 709.4(1) and 709.4(4)").

We start with the marshalling instructions. The court instructed the jury that Williams was guilty of sexual abuse in the third degree if the State proved these three elements:

> 1. On or about the 10th day of June, 2012, the defendant or person(s) the defendant aided and abetted performed a sex act with [L.M. for Count VI or J.K. for Count VII].
> 2. The sex act was performed while [L.M. or J.K.] was mentally incapacitated, physically incapacitated or physically helpless.
> 3. The defendant knew or reasonably should have known that [L.M. or J.K.] was mentally incapacitated, physically incapacitated or physically helpless.[5]

Another instruction defined the terms in the second element.[6]

> "Mentally incapacitated" means that a person is temporarily incapable of controlling the person's own conduct due to the influence of a narcotic, anesthetic, or intoxicating substance.
> "Physically helpless" means that a person is unable to communicate an unwillingness to act because the person is unconscious, asleep, or otherwise physically limited.
> "Physically incapacitated" means that a person has a bodily impairment or handicap that substantially limits a person's ability to resist or flee.

Williams does not dispute that he performed sex acts on L.M. and J.K. On appeal, he challenges the State's proof of the first definition of incapacitation—that the girls temporarily could not control their conduct because they were under the

---

[5] Knowledge is not an element of sexual abuse in the third degree under Iowa Code section 709.4(1)(d). The district court should not have included this requirement when marshalling Count VI and Count VII. The uniform instruction no longer lists this element. *See* Iowa Crim. Jury Instructions 900.3.3, cmt. (June 2019). But the State acknowledges these instructions as given are the law of the case on appeal. *See State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009) (holding when the defendant does not object to the instructions, "the jury instructions become the law of the case for purposes of our review of the record for sufficiency of the evidence.").

[6] These definitions roughly follow Iowa Code section 709.1A.

influence of a narcotic, anesthetic, or intoxicating substance.[7]  He asserts both witnesses changed their stories about being given pills, passing out, and waking up during the assaults.[8]

True, both L.M. and J.K. offered testimony at trial inconsistent with their statements just after the assaults.  For instance, L.M. told officers and the nurse who spoke with her that morning that she had been given pills, in addition to alcohol.  She told them she passed out and awoke to being sexually assaulted.  L.M. also told her friend, Tyrone, she had been drugged.  J.K. shared a similar version of events with the nurse who examined her.

By contrast, on the stand L.M. did not mention passing out.  Instead, she testified to being pushed down on the mattress and being aware of the assaults as they were happening.  When asked about the discrepancy between her initial belief that she had been "laced" and her trial testimony that she was just drunk, she said, "I just didn't feel normal, and I didn't know what alcohol feels like . . . ."  She testified

---

[7] In its appellee's brief, the State asserts that in L.M.'s case the prosecution proved she was either temporarily incapable of apprising or controlling her conduct due to the influence of an intoxicating substance (under the definition of mentally incapacitated) or had a bodily impairment that substantially limited her ability to resist or flee (under the definition of physically incapacitated).  *See* Iowa Code § 709.1A(1), (3).  The State's brief does not address the alternative of physically helpless.  *See id.* § 709.1A(2).  We acknowledge our case law is not terribly precise when discussing any distinctions and overlap among the three definitions of incapacitation.  *See generally State v. Tovar*, No. 16-1440, 2018 WL 6132269, at *4–5 (Iowa Ct. App. Nov. 21, 2018) (discussing application of three alternatives).

[8] Williams is especially critical of J.K.'s credibility.  He points out that the jury found he committed only simple assault against her in Count III, bypassing the greater offenses of sexual abuse in the second and third degree.  Williams sees the lesser verdict as a sign the jury did not believe J.K.'s testimony that he used force or that the perpetrators engaged in a "group effort."  From there, he contends J.K. is incredible on the intoxication issue.  We reject this contention.  The jury was free to accept or reject any of J.K.'s testimony.  *See State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

that she "felt like" she had been drugged. L.M. confirmed she drank "[a] lot" and "throughout the night." Indeed, when Tyrone and police met her at the park, she was groggy, lethargic, and slurring her words. Measured several hours later, her BAC was still over 0.10.

Likewise, J.K. testified to drinking heavily that night, though her BAC was not high when tested the following morning. She described feeling weird, sick, dizzy, and light-headed. She could not remember going for fast food. During the assaults, she felt "helpless" and unable to get away. In her words, she couldn't "even function." When police found her, she was frightened, disoriented, dazed, and confused. She said she did not know where she was or what happened.

Whatever discrepancies existed between the girls' contemporaneous statements and their trial testimony were for the jurors to sort out. It is the jury's job to decide which evidence to credit and what weight to assign various aspects of the State's case. *See Hunt*, 801 N.W.2d at 377; *Lowenberg*, 243 N.W. at 541.

Williams emphasizes the girls' toxicology reports did not show the presence of a "date rape" drug.[9] He also criticizes the girls' testimony denying they told anyone they had been drugged or passed out. But the jury could disregard those protestations. The defense did not object to the admission of the girls' statements to the officers or the nurses reporting how they felt that morning. Thus, the jury could rely on their earlier statements as substantive evidence of the crimes. *See*

---

[9] In closing argument, the trial prosecutor emphasized the State was not alleging the girls were drugged. And it is true, the State did not charge Williams under the definition of sexual abuse alleging he performed a sex act "while the other person [was] under the influence of a controlled substance, which may include but is not limited to flunitrazepam" (which is another name for the date-rape drug Rohypnol). *See* Iowa Code § 709.4(1)(c).

*State v. Russell*, 893 N.W.2d 307, 316 (Iowa 2017) ("Prior statements of a witness that are admissible as substantive evidence may be freely employed to impeach a witness on direct examination."); *State v. Potter*, No. 09-0579, 2010 WL 1875649, at *4 (Iowa Ct. App. May 12, 2010) (finding jury could reasonably believe witness's later description of incident rather than version offered to investigator during earlier interview). We resolve all reasonable inferences in favor of the verdicts. *See State v. Reed*, 875 N.W.2d 693, 704 (Iowa 2016). The jury could reasonably assign more credibility to the girls' closer-in-time accounts given to law enforcement and nurses than their in-court testimony five years after the incidents.

The record contains adequate evidence of intoxication by alcohol (or in J.K.'s case a combination of alcohol and marijuana) to support the jury's findings of mental incapacitation or physical helplessness. The state of a victim's incapacitation "'at any given moment is largely a question of fact.'" *State v. Tapia*, 751 N.W.2d 405, 407 (Iowa Ct. App. 2008) (quoting *People v. Teicher*, 422 N.E.2d 506, 511 (N.Y. 1981)) (discussing physical helplessness). The girls described feeling intoxicated, helpless, and unable to function. Both testified that they felt unable to leave. Evidence they had some level of awareness during the assaults does not preclude the jury finding they were incapacitated. *See id.* (holding defendant's actions could not be "separated into segments" when deciding whether the victim was physically helpless).

In sum, a reasonable jury could conclude the State proved beyond a reasonable doubt that L.M. and J.K. were mentally incapacitated or physically

helpless during the assaults. Taking the evidence in the light most favorable to the State, substantial evidence supports the verdicts of third-degree sexual abuse.

### B. Ineffective Assistance of Counsel

Williams next argues his trial attorney was constitutionally defective in several ways. To prevail, he must prove by a preponderance of the evidence that his attorney breached an essential duty resulting in actual prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Without adequate proof of either duty or prejudice, the claim fails. *See Thorndike*, 860 N.W.2d at 320. On the prejudice prong, Williams must show counsel's mistake was so serious as to deprive him of a fair trial. *See Strickland*, 466 U.S. at 687. It is not enough to show the mistake could have conceivably influenced the trial's outcome. *Thorndike*, 860 N.W.2d at 320. Rather, Williams must show that but for counsel's omission, there was a reasonable probability of acquittal. *See id.*

### 1. Motion to suppress interview and DNA test

Williams first argues counsel was remiss in not moving to suppress the interview and DNA sample he gave police. At the time of the crime, Williams was seventeen years old. Police seized him during the raid and took him to the station. After waiving his *Miranda* rights, he spoke with detectives and agreed to give a DNA sample before his release.

Williams premises his ineffective-assistance claim on the protections in Iowa Code section 232.11. This statute provides children with a "right to be represented by counsel" in juvenile proceedings. A child who is sixteen or older can waive the right to counsel "only if a good faith effort has been made to notify the child's parent, guardian, or custodian" of the child's location and the right to

confer. Iowa Code § 232.11(2). These protections apply during "proceedings within the jurisdiction of the juvenile court," which includes "the time the child is taken into custody for any alleged delinquent act that constitutes a serious or aggravated misdemeanor or felony under the Iowa criminal code, and during any questioning thereafter by a peace officer." *Id.* § 232.11(1). And section 232.8(1)(c) provides that violations by children sixteen years or older, "which constitute . . . forcible felon[ies] are excluded from the jurisdiction of the juvenile court." "A 'forcible felony' is any felonious child endangerment, assault, murder, sexual abuse, kidnapping, robbery, human trafficking, arson in the first degree, or burglary in the first degree." Iowa Code § 702.11 (2012).

Williams points to *State v. Harris*, 589 N.W.2d 239, 244 (Iowa 1999), which held that a juvenile murder suspect's waiver was valid because the officers made a good-faith effort to locate his parents. But the *Harris* decision did not directly determine the applicability of section 232.11. 589 N.W.2d at 244. In *State v. Hajtic*, 724 N.W.2d 449, 452 (Iowa 2006), the supreme court offered more discussion of this statute. Hajtic faced charges for burglary and robbery. *Hajtic*, 724 N.W.2d at 452. Ultimately, he was convicted of three counts of third-degree burglary and one count of first-degree robbery. *Id.* at 451. The court determined because Hajtic was one month shy of his eighteenth birthday, "he was entitled to the protection of our juvenile laws regarding his right to counsel *in the burglary cases*." *Id.* at 452 (emphasis added). The court clarified in a parenthetical: "The robbery charge is a forcible felony and, therefore, not subject to the juvenile code." *Id.* The court then found the police made a good-faith effort to notify Hajtic's mother. *Id.* at 453. So *Hajtic* applied the statute because the juvenile was being investigated for crimes

that were not forcible felonies, but the court rejected the duty to notify the parents for the forcible felony charge.

Here, police investigated seventeen-year-old Williams based on allegations of kidnapping and sexual abuse, both forcible felonies. His questioning, therefore, was not subject to section 232.11. Police had no obligation to locate his parent or guardian before accepting a waiver of his *Miranda* rights. We conclude counsel had no duty to move to suppress the interview and DNA test based on the protections in section 232.11. *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010) ("Counsel has no duty to raise an issue that has no merit.").

**2. Objection to alleged breach of plea agreement**

Williams next challenges his attorney's performance at sentencing. At the hearing, the State first recommended consecutive sentences for the two sexual-abuse convictions from the jury trial. Second, consistent with the plea agreement, the State recommended concurrent sentences for his later offenses of sexual abuse and marijuana possession with intent to deliver. Third, the State asked for the sentences from the trial to be run consecutive to the concurrent sentences from the plea agreement. That third proposal, according to Williams, breached the plea agreement. So what did the plea agreement say about this aspect of sentencing? Williams poses three possibilities: (1) the plea agreement included an unstated term allowing the State to ask for the sentences in the two cases to be run consecutively; (2) the agreement included an unstated term prohibiting the State from making that request; or (3) the agreement did not address the issue.

Because Williams cannot point to a provision in the plea agreement barring the State from seeking consecutive sentences, he cannot show the prosecutor reneged on the bargain. Silence is not evidence of an agreement. And "[i]f the State did not breach the plea agreement, defense counsel could not have been ineffective." *State v. Bearse*, 748 N.W.2d 211, 215 (Iowa 2008). This is not a case in which the record is inadequate to address the issue. Rather, Williams has not proven his claim of ineffective assistance of counsel.

### 3. Advice about possibility of consecutive sentences

Williams next contends the district court erred by failing to advise him at the plea hearing that the yet-to-be-imposed sentences in the jury-trial case could be run consecutive to the sentences in the guilty-plea case. Because Williams did not challenge his guilty plea by moving in arrest of judgment, he must raise this claim by alleging ineffective assistance of counsel.[10] *See State v. Brothern*, 832 N.W.2d 187, 191 (Iowa 2013).

The State contends counsel had no duty to move in arrest of judgment because Iowa Rule of Criminal Procedure 2.8(2)(d) only required the district court to advise Williams of penalties related to the "offense to which the plea is offered." *See State v. Carmer*, No. 18-0674, 2019 WL 478520, at *1 (Iowa Ct. App. Feb. 6, 2019) (holding "maximum punishment" only related to offense at issue in the plea

---

[10] The State argues we cannot reach this issue because new Iowa Code section 814.29, effective July 1, 2019, bars challenges to guilty pleas on appeal unless the defendant can prove it is "more likely than not [that he] would not have pled guilty if the defect had not occurred." Whether this amendment applies to convictions entered before the effective date is pending in the supreme court. *See State v. Treptow*, No. 19-1276. Applying the rationale of *Macke*, 933 N.W.2d at 228 and *State v. Gordon*, 943 N.W.2d 1, 5 (Iowa 2020), we assume the amendment does not apply retroactively.

proceeding); *see also State v. Brammeier*, No. 10-1157, 2011 WL 2556076, at \*2 n.3 (Iowa Ct. App. June 29, 2011) (finding "no requirement that a defendant be informed that the sentence being imposed will be served following a sentence the defendant is already serving for a separate and prior crime").

But Williams insists his case is governed by *State v. White*, 587 N.W.2d 240, 243 (Iowa 1998), where our supreme court held that an accused must be fully aware of the possibility of consecutive sentences because they may be the direct consequence of a guilty plea. He notes the district court set a combined sentencing hearing for all four convictions just after he entered his guilty pleas.

What we don't know on this record is what advice Williams received from his attorney about the possibility of consecutive sentences. Because we do not know whether Williams indeed had that information, we cannot fully assess his claim. Thus we preserve the issue for further development and evaluation in PCR proceedings. *See State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018) (encouraging preservation of ineffective-assistance claims).

### C. Sentencing Considerations

#### 1. Mitigating factors for juvenile offenders

Beyond his claims of ineffective assistance of counsel, Williams argues we should set aside his sentence because the district court did not consider the *Miller/Lyle* factors for sentencing juveniles.[11] He cites *Crooks* for the proposition that when sentencing a juvenile to prison time, even without a mandatory-minimum

---

[11] Our courts have sometimes called these the *Miller/Lyle/Roby* factors. *See, e.g.*, *State v. Majors*, 940 N.W.2d 372, 384 (Iowa 2020); *see also Miller v. Alabama*, 567 U.S. 460, 477–78 (2012); *State v. Roby*, 897 N.W.2d 127, 135 (Iowa 2017); *State v. Lyle*, 854 N.W.2d 378, 404 n.10 (Iowa 2014).

sentence, the court must consider the *Miller/Lyle* factors. 911 N.W.2d at 153.

Those factors include:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Lyle*, 854 N.W.2d at 404 n.10 (citations omitted).

*Crooks* held that once the court has decided not to impose a minimum period of incarceration, the *Miller/Lyle* factors remain relevant to the other sentencing options. 911 N.W.2d at 173. But "the court is not required to specifically examine and apply each factor." *Id.* These factors can mitigate a sentence like any other relevant extenuating factors not related to youth. *Id.* The appellate court can find an abuse of discretion if the sentencing court ignores a relevant factor that it should have given significant weight. *Id.*

The sentencing hearing featured information about Williams's youth. Both defense counsel and the prosecutor noted his age at the time of the crime and the difficulty of his circumstances when discussing mitigating factors. Considering Williams's youth, the court veered away from imposing a set sentence before he was eligible for parole on the crimes tried by the jury: "First of all, there is no mandatory minimum on these—on these offenses. The parole board will be able to make a determination as to when you should be released."

The court then focused on the circumstances of the crimes and the impact on the victims:

> The court has specifically determined that the consecutive sentences are appropriate given the fact that there were in the case in which the jury found you guilty two victims who were greatly affected by this. We heard the testimony of them at trial. This was although not found by the jury to be by force, certainly a case in which these two individuals were—were in a basement unable to leave where multiple people were present. Multiple people engaged in sex acts with them. Just the—the circumstances of that case make—make the fact that these sentences should run consecutive appropriate.

Turning to the more recent crimes, the court considered Williams's recidivism and the danger posed by his conduct:

> Regarding the new charge in which you pled guilty, you had every opportunity to show that—that you could live without violating the law, and instead, you picked up a new charge with another young girl that was clearly—clearly illegal, and the court finds that given that what you were facing, the fact that you were involved in a new crime makes consecutive sentence in that case appropriate as well.
>
> It is the court's thought that, again, looking at what's contained in the presentence investigation report, the board of parole will be able to look at this and make a determination as to when it will be safe for you come back out on the streets. The court hopes that that's soon. But if by chance they find that you still haven't figured this out and still haven't learned that you can't be having sex with young girls or in these kinds of situations you are a danger, and until you get that through your head that that isn't appropriate, and therefore the board of parole and the prison people will be able to hold you for an extended period of time if you don't follow through with—with the treatment that you're given and face the reality that what you did was wrong.

It is clear from the court's introduction that it considered Williams's status as a youthful offender. Because the court was not required to explicitly mention the *Miller/Lyle* factors, we find no abuse of discretion. *Seats*, 856 N.W.2d at 552 (review of a sentence within the statutory limit is for abuse of discretion); *see also State v. Davis*, No. 18-1259, 2019 WL 1300445, at *1 (Iowa Ct. App. Mar. 20, 2019)

("The district court must consider certain factors when sentencing juveniles, but it must expressly do so only when imposing a mandatory minimum sentence.").

Even without "formal mandatory minimum sentences," Williams asserts he faces a de facto mandatory minimum because of the long wait-times endured by inmates before they can complete sex-offender treatment, a condition of release. Because this policy issue is outside our purview, we decline to address its impact on Williams's sentence.

### 2. Unproven offenses

Resentencing is appropriate if the record contains "clear evidence" that the sentencing court relied on unproven or unprosecuted offenses. *State v. Sailer*, 587 N.W.2d 756, 762–64 (Iowa 1998). In his final complaint, Williams argues the sentencing court improperly considered unproven offenses.

He objects to the court's reference to the witnesses being "unable to leave" the basement "where multiple people were present." Williams points out the jury acquitted him of kidnapping in the first degree. But the jury did return a verdict on the lesser-included offense of sexual abuse in the third degree by either "force or against the will" of L.M. or through her incapacity. Because this was a general verdict, the court could consider Williams's actions to detain L.M. in the basement to complete the sexual assault. Similarly, the court was free to reflect on other circumstances proven by the State in connection with the sexual-abuse counts. For instance, the court could weigh J.K.'s testimony that she recalled people holding her down.

Williams also worries the court treated the "group effort" by the perpetrators as an aggravating factor even though the jury acquitted him on second-degree

sexual abuse and conspiracy charges. The record shows the victims endured sexual abuse by several attackers, including Williams. The sentencing court did not abuse its discretion by considering the severity of the crime and its impact on the victims. *See State v. Longo*, 608 N.W.2d 471, 474 (Iowa 2000) ("[W]hen a challenge is made to a criminal sentence on the basis that the court improperly considered unproven criminal activity, the issue presented is simply one of the sufficiency of the record to establish the matters relied on.").

### D. State's Challenge to Merger

The State raises the next issue. It contends the court erred in merging the four guilty verdicts from the jury trial into two convictions. The State contends "[t]he district court lacked authority to merge the convictions and the State now moves to correct that illegal sentence." Problem is, the State did not cross-appeal or otherwise ask for review of the merger rulings.

In the State's view, it did not need to cross-appeal because the mergers resulted in illegal sentences, which can be "raised at any time." The State relies primarily on *State v. Love*, 858 N.W.2d 721, 723 (Iowa 2015), where the court held the unlawful *failure to merge* convictions can be raised at any time because the situation results in an illegally harsh sentence. The State does not cite a case in which an appellate court entertained a challenge to a faulty merger that was raised for the first time in an appellee's brief.[12]

---

[12] In a post-argument notice of additional authority, the State cites *State v. Wieneke*, No. 20-0126, 2021 WL 219222 (Iowa Jan. 22, 2021), a per curiam opinion not to be published. The supreme court granted further review of our opinion in which we found the district court imposed an improper split sentence. *State v. Weineke*, No. 20-0126, 2020 WL 594460, at *2 n.2 (Iowa Ct. App. Oct. 7, 2020); *see also State v. Formaro*, 638 N.W.2d 720, 742 (Iowa 2002) ("[S]ection

The State also relies on *State v. Ohnmacht*, 342 N.W.2d 838 (Iowa 1983) for the proposition that neither waiver nor estoppel preclude the correction of Williams's illegally lenient sentence. In that case, Ohnmacht asserted the court should dismiss the State's appeal from the grant of probation for a forcible felony. *Ohnmacht*, 348 N.W.2d at 841. Ohnmacht argued the attorney general exceeded its authority in filing the appeal. *Id.* The court rejected that argument, holding the attorney general acted both "properly and promptly" by moving in the district court for correction when he first learned of the illegal sentence. *Id.* at 843. The *Ohnmacht* holding does not allow the State-appellee to seek a reversal of a merger for the first time on appeal. Because the State did not cross-appeal, we decline to address the merger issue. *See State v. Goodson*, No. 18-1737, 2020 WL 3571803, at *10, n.13 (Iowa Ct. App. July 1, 2020) (noting prevailing party may not seek more favorable ruling than it obtained in trial court without filing cross-appeal).

Because we find no basis for reversal, we affirm the convictions and sentences.

**AFFIRMED.**

---

901.5(3) [1999], which authorizes a sentencing judge to 'suspend the execution of the sentence or any part of it,' is only intended to authorize the suspension of a portion of a sentence in regard to determinate sentencing orders. No such authority exists with respect to an indeterminate sentence." (footnote omitted)).

In *Weineke*, the supreme court vacated and remanded based on Iowa Rule of Criminal Procedure 2.24(5)(a) which provides "[t]he court may correct an illegal sentence at any time." 2021 WL 219222 at *1. The court explained: "Because the illegality in this case is clear, we exercise our discretion to correct it now." *Id.*

But *Wieneke* does not change our analysis. Unlike the split sentence in *Wieneke*, the illegality alleged by the State is not "clear" from the record. In fact, for one of the mergers, the State is taking a different position on appeal than it did at trial. And one of the State's theories relies on finding four convictions based on four separate acts, a task beyond the correction contemplated in *Wieneke*.